## A. B. SCOTT v. STATE.

No. A-6140. Opinion Filed June 8, 1929.
(278 Pac. 393.)

Lunsford & Windham, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was convicted in the district court of Le Flore county, of arson in the second degree, and his punishment fixed at two years in the state penitentiary. Motion for new trial was filed and overruled, and defendant duly excepted and has appealed to this court.

The state to sustain the allegations called J. T. Pope, who testified that on the 1st day of July, 1922, he lived on the southeast quarter of section 9, township 4, range 26 east; that he had a dwelling house built especially for a dwelling; he had a two-room house with a porch across the north side of it near his home; to the best of his recollection on the 23d day of March, 1922, he was awakened

by a fire; the two-room house was burning down; "It was immediately south of the house in which I lived."

The state offered in evidence the subpoena for Jeff Davenport as a witness on behalf of the state, which was objected to by the defendant, and the objection overruled; the subpoena was offered in evidence, and showed that it was issued at Poteau, on the 25th day of September, 1925, and returned on September 26, 1925, showing that Jason Milsap is in Ft. Smith, and Jeff Davenport somewhere in Texas, not found in Le Flore county.

The state then called Ruth Brannan, who testified she reported the testimony of Jeff Davenport in the preliminary hearing, in the case of State of Oklahoma v. A. B. Scott, and that she transcribed the testimony. The state then offered the testimony of Jeff Davenport taken at the preliminary as shown by the reporter. The defendant objected to the introduction of this transcript—

"For the reason that the shorthand notes taken is the best evidence; and second, because under no phase of this case has a proper foundation been laid for the introduction of this transcript, or her shorthand notes either, because before they can be introduced in evidence they would have to prove that the witness is not in the state, and that has not been done.

"County Attorney: I have offered in evidence the return of the officers made properly to support that fact if the court desires further proof of that.

"Court: You had better call the officer who made the return."

The officer who made the return was not called, but J. T. Pope was recalled and stated he was acquainted with Jeff Davenport, and something like a month ago he heard from him; he was in Sherman, Texas, or on a rural route

out of Sherman. The defendant objected to the witness' testimony on the ground that if he had a letter from Jeff Davenport, the letter itself would be the best evidence.

"The Court: Have you the letter, witness? A. I don't have it with me.

"The Court: He is not trying to prove what he stated in the letter.

"By Mr. Babb: Is he around or about Zoe, at this time or not, in the country? A. I don't think so.

"Mr. Lunsford: We desire to object further for the reason that the post mark is the best evidence of where it was mailed and where it came from.

"The Court: The objection is overruled.

"Defendant excepts."

On cross-examination the witness was then asked by the county attorney if he could swear of his own knowledge that this witness is not within the state of Oklahoma, and he answered, "No, sir." The county attorney then offered in evidence the transcript of the testimony of Jeff Davenport which was taken at the preliminary trial in the case of the State of Oklahoma v. A. B. Scott. Defendant objected for the reason there had been no competent evidence introduced which was sufficient to support the finding of the court that the witness Jeff Davenport is dead or without the jurisdiction of this court and cannot be produced to testify in person.

"The Court: Of course the evidence of the witness Pope to the effect that he had had a letter from the witness some time about a month ago would not be sufficient proof of the absent witness from the state, but there being a return of the officer whose duty it was to subpoena this witness showing that he is in Texas is sufficient to let in the statement of the witness given at a

former trial which was a preliminary, where the defendant had an opportunity to and perhaps did cross-examine him. I don't know whether he did or not but he had the opportunity to. The objection is overruled.

"Mr. Windham: Defendant excepts."

The transcript of the record of the Jeff Davenport testimony was then read by the county attorney, in which Davenport stated he had rented the blacksmith shop from the defendant at Zoe, and that in the spring of 1922, and before Pope's house was burned, witness came down to the shop and "asked me if I would do him a favor, and I said it was owing to what he wanted. He said there was some money in it, 'I will give you $350 if you will set fire to Pope's house so it will burn the big house'; and I said, 'I cannot do that, for it will be found out sooner or later.' Some fellow came in and he went out. That evening I went to his house to get a brace and bit. While there defendant took me around the house and got those things, and pulled out a roll of greenbacks and counted out $50 and gave it to me and said, 'Do that and I will pay you the rest.' That evening I set fire to the small house. It was near the Pope house on the west side. I whittled kindling off a pine stump and set fire to it. The next morning I saw defendant on the porch as I came to work. I stayed at Lee Mullins' that night. I went to see him next morning, and he said, 'How did you make it?' I shook my head, all right. The second day after that, as I came back from Stapp, I saw him. Defendant said, 'You did not do what I asked you to do,' and I said, 'I did the best I could.' He said he would not pay me one cent, and I said I had a notion to sue, and he said, 'Sue and be damned,' and turned and walked off. I quit the shop and went to Redland; left there and came back to Poteau and tried to get this money. When I asked him about it, he said he wasn't going to

pay me. I was arrested on a charge of arson and pleaded guilty and received a sentence that expires today." On cross-examination the witness, in substance, restated what he had stated in direct examination with reference to defendant hiring him to burn Pope's house, and that he stayed at Lee Mullins' house the night of the fire; he ate supper at Will Gillam's; that Gillam's house was something like a mile and a half from Pope's; it was tolerably late when he came to Mullins' place. The witness stated he did not have a racket with defendant over the shop; that he worked about a day in the shop after he claims he set fire to the house; Pope and Taylor have not paid me any money since the house was burned; they sent me money to keep me in tobacco, and I mean to pay that back; they sent two, three, or four dollars at a time; I did not claim to any one that old man Scott had threatened to have me arrested for embezzlement.

Jason Milsap was called, and stated he lived last year at Zoe; knew the defendant A. B. Scott and J. T. Pope; he had had a conversation with defendant down between the house and barn just after the new year a year ago last new year; "we was out looking at the barn, and he said, 'Do you want to make some money easy?' and I said, 'Sure if I can make it honest'; I said, 'I never made any easy money,' and defendant said, 'I have a problem and you can make some easy money,' and I said, 'all right, tell it.' 'You take out big insurance on the house and the things in it, they will not have to know what we have in there'." This was objected to by the defendant, and the county attorney stated he was leading up to the conversation about the Pope house. " 'You burn the house and give me the insurance, and I will give you a deed to this place; if you will burn Pope out I will make you a deed to this place,' is the very words the old man said to me, and I told

him, 'No, you will have to let me study about that,' and in about two weeks he came to my house and asked me about the matter again, and I said, 'I can't do that.' He said he got a fellow to burn Pope out; that he did not burn him out; that he was to pay him $350; that he paid $50, but he said he did not have the nerve; he burned the small house and ran off'." On cross-examination witness stated: "Yes, sir, I was afraid of him: I was not exactly afraid of him just afraid he might do something to me." Witness was then asked why he took that much time to study it over. The state objected, the objection was sustained, and defendant excepted. "Scott and I did not have a racket over some land, I was planting some cotton, and there was a piece covered with bermuda grass; I was letting that lay out; I agreed to let a man by the name of Stanford have it for a watermelon patch; the defendant came up and tried to run him off, and I told him I had rented the land and that I would run it, and he acted like he was going to do something, and I said, 'Old man, don't fool with my farm, for if you do I will slap the fool out of you,' that is what I said."

Considerable testimony was offered and objected to and sustained by the court with reference to cases against the witness on whisky charges. Witness admitted that he had been convicted on a whisky charge. This is in substance the testimony offered by the state, at the conclusion of which the defendant moved the court to strike from the record and exclude from the jury the testimony of Jeff Davenport contained in the transcript of the record taken at the preliminary and introduced as evidence in this case, for the reason that there was not a sufficient foundation laid for the introduction of the said transcript in evidence in this case. The motion was overruled, and defendant duly excepted. The defendant then requested

the court to advise the jury to return a verdict of not quilty in the cause, for the reason that the state had not introduced testimony sufficient to sustain a conviction, and for the reason that the testimony of Jeff Davenport, an accomplice in this case, is not sufficiently corroborated by any competent evidence to justify consideration of the facts by the jury. Which request was overruled, and defendant duly excepted.

The defendant testified in his own behalf and stated that he had never promised to pay, or talked to Jeff Davenport about burning Pope's house; and that he had never had a conversation with Jason Milsap about burning Pope's house; that a bad feeling had existed between himself and Milsap for more than a year; Jeff Davenport worked in the shop for him for a while; "I threatened to have Davenport arrested for embezzlement of some material, or things he had at the shop; after we had trouble he left; he did not tell me where he was going; when I talked to him about the stuff he had taken, he said he would pay me the next morning; but the next thing I heard of him, he was gone." On cross-examination witness stated Davenport had been in his shop three or four weeks; he was sleeping at Virgil Nichols'; "he had a batching outfit at the shop when he first started in down there; I had been seeing Davenport at intervals for years before he came to my place; he had gathered corn for me a day and a half at one time; Milsap was on my place two years; I have been convicted and served a term in the penitentiary for larceny of cattle; this was in 1896; I have been living down about Zoe and Heavener ever since; I was pardoned and restored to citizenship."

Virgil Nichols, called as a witness for defendant, testified he knew Jeff Davenport; he saw him when he was leaving; "he left the key with me; he said Scott was aim-

ing to have him arrested, something about the shop; I don't know whether I had a conversation with him after his preliminary or not; I had a conversation with him down in the jail; he said he did not burn Pope's house; that he was not guilty of burning the barn, but pleaded guilty; they told him if he did not plead guilty he would get five years; I was at Stapp when I had the first conversation with Davenport; I was working there on Bushaw's place; it was at my house; my wife was present; she is not here to-day; there was no one else present; I told Mr. Scott about this; he come to see me."

Lee Moulton stated he was acquainted with Jeff Davenport; "he stayed at my house one night before his wife's death, and stayed one night after her death, something like two years apart; after his wife's death, when he came it was about 8 o'clock and he stayed all night; he slept with me and did not leave there during that night; it was somewhere in the neighborhood of the time this house of Pope's was alleged to have been burned; it was some time after he stayed there before I heard of the fire."

Mrs. A. B. Scott testified she was the wife of the defendant; she remembered when Jeff Davenport came to their house to get a brace and bit; she was in the kitchen with her daughter, Lucile; the defendant went out to the smokehouse just a few steps from the door and got the brace and bit, and defendant went on back; "my husband did not pay him any money that time; they were not out of my presence or sight during the time they were out there."

Lucile Scott, the daughter, testified she remembered Jeff Davenport came to the house and wanted to get a brace and bit; "I was in the kitchen with mother, and

my father went to get the brace and bit for him; they were not out of my sight while he was there; my father did not pay him any money or anything of the kind." On cross-examination she stated she was in the kitchen in the door; "I saw my father get the brace and bit; he came into the house through the kitchen door; when my father came to get the key to the smokehouse we were putting up the dishes."

T. B. Lunsford testified for the defendant, stating he was one of the attorneys for the defendant; that some time after Jeff Davenport was incarcerated in the jail at Poteau, Davenport sent for him and had a conversation with him regarding the burning of the house and "told me he had nothing to do with it; later he told me a man by the name of Taylor, who was some kin to him and was raising his little girl for him, burned the house, and that Taylor and Pope had been down to the jail and talked with him and told him they had framed up on him and that he would not get out for less than five years unless he pleaded guilty." On cross-examination the county attorney repeatedly asked the witness why he had not come to him and tell him what Davenport had said; he told him he was not representing Davenport and for that reason he had said nothing about it.

Dick Windham also testified, for the defendant, that he knew Jeff Davenport; "Mr. Lunsford was not my law partner at the time"; he saw Davenport one time while in jail, and that Davenport told him he did not burn the Pope building. On cross-examination witness stated the jailor called him to the jail; said there was a man down there who wanted to see him; "I did not represent him because he did not make any arrangement with me."

This is in substance the testimony introduced for the defendant.

The defendant in this case urges that the court committed several errors in the trial of this case. The assignment of errors that we deem necessary to consider is the first error, which is that the court erred in overruling his motion for a new trial. The fifth, that the district court erred in admitting, in evidence, over the objection of the defendant, the purported transcript of the evidence taken at the preliminary trial of Jeff Davenport, without a proper showing being made as to the state being unable to procure the testimony of the witness Jeff Davenport. And it is further urged that if the proper predicate was laid for the introduction of the testimony that it showed him to be an accomplice and that there was insufficient testimony to sustain the judgment. That the court committed an error in admitting the testimony of Jason Milsap as to the conversation he claimed to have had with the defendant some time after the alleged fire, which was not sufficient to corroborate the testimony of the witness Davenport, if the transcript of the testimony of Davenport was properly admitted.

The first question to be determined is: Was the predicate laid by the state sufficient to justify the court in admitting, over the objection of the defendant, the transcript of the witness, Jeff Davenport? In order to arrive at a proper decision in this case, it is first necessary to consider that in the introduction of the subpoena issued by the state for Jeff Davenport and Jason Milsap it was issued on the 25th day of September, 1925, and the sheriff made his return on the 26th day of September, 1925, showing that Jason Milsap was in Ft. Smith and Davenport in Texas; the trial in this case was not begun until the 8th day of October, 1925, notwithstanding the return showed Jason Milsap was in Ft. Smith, he was on hand, and testified in the case. Milsap was not used as a witness

in the preliminary. The prosecuting witness in this case was called, and he testified that he received a letter from Davenport about a month previous to the date of the trial, and that he was at Sherman, Tex., or on a rural route out of Sherman. The court in his ruling held that the statement of the prosecuting witness that he had received the letter from Davenport a month previous was not sufficient to justify the court in permitting the transcript of the testimony of Davenport being introduced, but in view of the fact that the sheriff's return showed Davenport in Texas, he would hold that was sufficient. The defendant excepted to the ruling of the court.

After a careful examination of the record in this case, we find that the showing made by the state as a condition precedent to the introduction of the testimony of Jeff Davenport, taken at the preliminary trial, was that this case was set for trial on the 8th day of October, 1925; that on the 25th day of September, 1925, a subpoena was issued by the Clerk for the witness Jeff Davenport; that on September 26th, the following day, said subpoena was by the sheriff returned with the following indorsement:

"Jason Milsap in Ft. Smith and Jeff Davenport is somewhere in Texas; not found in said county of Le Flore.

"Monroe Self,
"Sheriff of Le Flore County,
"By C. W. Crawford,
"Undersheriff, Deputy."

There was no showing that Davenport was dead or beyond the reach of court process, or that he was sick and unable to be present at the trial, and no proper diligence was shown to procure his attendance. It appears from the record that notwithstanding the return showed Milsap in Ft. Smith—and we infer that means Ft. Smith, Ark.—Milsap was present and testified in the case. It is

not contended that Milsap was called as a witness in the preliminary trial, but he was on hand to testify in the trial of this case on October 8, 1925.

The court directed the county attorney to call the officer who made the return on the subpoena, but for some reason the officer was not called by J. T. Pope, whose building was alleged to have been burned; testified he received a letter about a month previous to the trial from Jeff Davenport, which the court held was not sufficient to show that Davenport was outside the state. This court has repeatedly held that the rule admitting the transcript of the evidence of an absent witness as his deposition on final trial. grows out of circumstances of necessity. The transcript or deposition of the testifying witness shall be excluded in all cases where the witness can be produced in person. The main reason for this is that the accused may desire to cross-examine the witness further, and that the jury be given an opportunity to observe the witness and his demeanor on the witness stand. This question has been before this court a number of times.

The case of Davis v. State, 20 Okla. Cr. 203, 201 Pac. 1001, in which the limitations of the rule were discussed and stated, supported by authorities therein cited, is in harmony with the statements made herein. It is not unusual the cross-examination of the witness in the preliminary trial is more or less perfunctory, and that by the time the case is on final trial the defendant has had more time for research and is better able to conduct a thorough cross-examination, and if it is proper for the witness to be produced, it is the right of the defendant to have him present. Diligent effort made in good faith to produce the witness at the trial should be shown. Golden v. State, 23 Okla. Cr. 243, 214 Pac. 946.

We think this court in former opinions has followed a rule sufficiently liberal in permitting the testimony of the witness taken at a former trial, or a preliminary hearing, to be used in the absence of the witness, and that this should not by judicial construction extend or enlarge upon the rule announced in its former decisions. Cases perhaps would arise where the prosecuting officer might prefer to have the testimony taken at a former trial read to the jury, rather than run the risk of having the witness appear in open court on the witness stand to be subjected to rigid cross-examination, where the jury could see the witness and judge of his demeanor on the witness stand. To lay down a rule that a mere showing that the witness is in another state, without requiring a showing that due diligence had been used to secure the attendance of the witness, might enable public prosecutors and others, if it appear to their interest, to cause witnesses to be absent from the jurisdiction of the court to escape further cross-examination. If it is possible to do so, the defendant in a criminal action has the right to be confronted face to face with the witness against him. We do not think the return of the deputy sheriff on the subpoena issued for the witness Jeff Davenport was sufficient predicate to authorize the admission of the transcript of the witness' testimony, taken in a preliminary trial. The deputy making the return should have been called and interrogated as to his knowledge as to the whereabouts of the witness upon which he based the return. We do not mean to say, or intimate, that the county attorney, or those interested in this prosecution, did not desire the presence of the witness Jeff Davenport. What we do mean to hold is that it would be dangerous to relax the rule that reasonable effort and diligence to produce the witness should be shown. In our opinion no such showing was made here. The return of the subpoena shows that the sheriff could not have

exercised very much diligence in trying to find the witness, as the subpoena was issued one day and the return made the following day, and the testimony of the main prosecuting witness seems to indicate that he had heard from the witness from a definite place in the state of Texas. This subpoena was returned 13 or 14 days before the case was assigned for trial, and there is no diligence shown whatever on the part of the officers to try to locate this witness. Houser v. State, 41 Okla. Cr. 128, 271 Pac. 857.

It is urged by the state that the predicate laid for the introduction of the transcript of the evidence of the witness Jeff Davenport is sufficient to authorize the court to admit the evidence taken at the preliminary trial, citing Edwards v. State, 9 Okla. Cr. 306, 131 Pac. 956; Jeffries v. State, 13 Okla. Cr. 146, 162 Pac. 1137.

These cases have been carefully read and studied, and we do not think that the predicate laid in this case for the introduction of the transcript of the evidence is shown as strongly as it was in the cases cited by the state.

There are other errors assigned by the defendant, but, the view we take of this record, we do not deem it necessary to consider them. We hold that a sufficient predicate was not laid for the admission of the transcript of the evidence of the witness Jeff Davenport, and, as there is no competent testimony sufficient to sustain the judgment and conviction against the defendant without the evidence of the absent witness Davenport, the objections of the defendant to the admission of the transcript of the evidence was well taken and should have been sustained.

The judgment is reversed and remanded for further proceedings in accordance with this opinion.

EDWARDS, P. J., and CHAPPELL, J., concur.