## JOE KIZER v. STATE.

No. A-9400.   July 28, 1939.
(93 P. 2d 58.)

For former opinion, see 65 Okla. Cr. 247, 85 P. 2d 330.

O. A. Brewer, of Hugo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

DAVENPORT, J. On rehearing, the petition of the defendant for rehearing is sustained, and the law and facts reconsidered.

Joe Kizer was by information jointly charged with John Kizer in the district court of Choctaw county with the crime of murder; was tried separately; convicted of manslaughter in the first degree; and sentenced to serve a term of 50 years in the state penitentiary.

Motion for a new trial was filed, considered, overruled, exceptions saved, and the defendant has appealed.

The case of the defendant, Joe Kizer, was called for trial on the 7th day of April, 1937. Hal Welch, as a special prosecutor, and M. W. Gross, county attorney, appeared for the state. The defendant appeared in person and by his attorney, O. A. Brewer.

The defendant's counsel moved the court to quash the panel and continue the cause for the reason that when the

case was called on the morning of April 7, 1937, the county attorney called out the names of witnesses and, among others, the name of one Merle Slaton. Her father was in the courtroom and advised that the witness was not present, but was visiting in the state of Arkansas.

The county attorney in the presence of the entire jury panel made the statement: "Why did she take such a sudden notion to leave and go to Arkansas?"

The defendant in his motion contended that the statement of the county attorney made in the presence of all the jury panel left the implication with the jury panel that the defendant or some one for him had caused the absence of the witness, and procured the same.

The defendant further contended that such statement, regardless of the effect it had or did not have on the jurors, would leave some impression on their minds in their deliberation of the case, and precluded the defendant from having a fair and impartial trial by a jury of his peers.

This motion was overruled by the court, and the defendant excepted.

The defendant further excepted to the ruling of the court for the reason that he insisted that the court had deprived him of his right to offer testimony, and make a showing by offering witnesses that the statement made by the county attorney had some impression on the minds of the jurors, composing the panel.

The court stated:

"I have not denied that. The court finds that the statement made by the county attorney, made in the presence of the jury, was as stated in the defendant's motion. The court further finds that the jurors may be questioned and qualified as to whether or not said statement would have any bearing in their trial of this case; and if said jurors answer in the affirmative, they may be excused for cause; and the court admonishes the jury at this time not to consider the statement made by the county attorney for any purpose whatever."

Mr. Hal Welch, an attorney of the Bar, who was employed specially to assist in the prosecution, was called as a witness, and examined by the county attorney, and stated in substance:

"I was employed by members of the family of the deceased, and assisted in the prosecution of the case of John Kizer and Joe Kizer at the last term of court. A severance was asked and granted, and the defendant John Kizer was tried, I believe, in October, 1936. A subpoena was issued for the witness Mrs. Merle Slaton requiring her attendance on the court on the 14th day of October, 1936, which is the usual form. I do not know, but I imagine she was discharged from the attendance of the court on that hearing. I have never seen the discharge."

The defendant called the court clerk, and he identified what had been marked as Defendant's Exhibit "A", which is a discharge of witnesses, showing that Mrs. Merle Slaton was on the 22nd day of October, 1936, discharged as a witness in the case.

It was then stipulated by and between the prosecutor and defendant's counsel that no subpoena had been issued for Mrs. Merle Slaton to attend the trial of Joe Kizer, in which this hearing is being had.

H. M. Pardoe was called by the defendant and stated in substance:

"My name is H. M. Pardoe. I am a member of the jury panel. I was in the courtroom this morning when the State v. Joe Kizer was called. Yes, sir, I heard a statement of the county attorney. It was in regard to one of the witnesses leaving the jurisdiction of the court, and going over in Arkansas. I afterward saw you in the county attorney's office. I expressed an opinion as to whether or not I would be qualified as a juror after hearing that statement."

"By Mr. Welch: Just a minute, that's what I objected to."

Witness Pardoe asked if it was all right to state what he said, and the court said, "Sure."

"I made the remark that naturally that would come into my mind all through the trial. I heard the admonition of the court, admonish the jury not to consider the statement made by the county attorney for any purpose. I do not know, Judge, whether or not I could follow the instructions of the court or not. Naturally it could come in my mind. I think it would come back in my mind. I want to try to go by the evidence of the case, but naturally that would come into my mind along. I would say that I do not want to sit on the jury after hearing that remark. By the Court: You may be excused from jury service."

The defendant's counsel then stated to the court:

"I think that would be the condition of the mind of every juror. By the Court: If they say that, I will excuse every one of them. By Mr. Brewer: I offer this evidence to show that the entire jury panel is disqualified. By the Court: Let the record show that this juror is disqualified. By Mr. Brewer: I want to offer the evidence to show the state of mind of the jury."

The offer was refused as to the entire jury.

"By Mr. Brewer: We except. By the Court: Is there any other record you want to make? By Mr. Brewer: We want to present that as a motion for continuance and a motion to quash the panel and continue this case. By the Court: The motion for continuance and motion to quash the panel is overruled. By Mr. Brewer: We at this time offer in evidence each individual juror in support of our motion to disqualify, in the presence of the other jurors. By Mr. Welch: We have no objection to it. Is it your request that the court permit you to call each member of the jury panel into court separately, out of the presence of the other jurors, and interrogate them? By Mr. Brewer: To offer each individual juror. By the Court: That is so far removed from the general practice of courts throughout Oklahoma, the court will have to refuse that offer. By Mr. Brewer: Refused, and exception allowed. By the Court: Call the jurors in."

Dr. Boyer, testifying on behalf of the state, stated that he examined the body of Jordan Swink the night he was shot.

"He was in the house on a bed, or a couch of some kind, at the time I examined him. It was about 2 a.m. in the morning. We removed his clothes from his body. My examination showed that he had died from gunshot wounds. Starting in from the left side, a bullet entered somewhere near the middle of the left arm, passing inward and backward. There was another shot. This bullet didn't come out. Another bullet passed beneath the collar bone, clavicle, about midway between the the breast bone and shoulder, and passed inward and back, and did not come out. Another entered the breast bone, sternum, about two inches from the top. That bullet passed through in this direction, and came out along there (indicating). It did not hit the arm, but passed out about there (indicating). There was one in the chest. There were three bullet holes in the left hand. Two entered near the same place, and in the left hand one came out near the thumb and finger, another came out through the ball of the thumb. The thumb bone was broken. One entered the wrist and broke a part of the arm about an inch below the wrist on the inner side. I found three bullet holes in the chest or body, and three in the hand. Some of those in the hand may have been from those that passed into the body. There were six entrance holes and four exit holes."

Sam Johnson, testifying for the state, stated:

"My name is Sam Johnson, and I live in Valliant, in McCurtain county. I knew Jordan Swink in his lifetime, about ten or twelve years. I remember the day that Jordan Swink was shot and killed. I saw him in the morning before he was killed that night. Jordan Swink came to Valliant about 9 o'clock that morning and I went with him to Paris, Tex. We returned to Valliant about 5 in the afternoon. I was with him all day. We stopped at Hugo as we were going to Paris. When we returned, we came back by Jordan Swink's house, and I went on to Valliant with him. He went home and left his old shoes, hat, and coat, and put on some new ones he had bought while we were in Paris. He took two of his children with him when we left his home, and we went on back to Valliant. I got out at Valliant. He told me he was going to Idabel."

Defendant's counsel objected to what Swink told the witness, and the court overruled the objection. Exception

was saved by the defendant on the ground that what Swink told the witness Johnson was hearsay and was not admissible.

"I know the defendant Joe Kizer. He lived, I guess, something like a mile from Jordan Swink. I don't know how far it was, but something like that * * * hardly a mile. I don't know the exact distance. Mr. Kizer lived something like a quarter north of Highway No. 76. By a juror: That mark is the county line? A. Yes, sir, a quarter to the line from where Mr. Kizer lived. By Br. Brewer: That does not represent an accurate picture. By Mr. Welch: They may ask him about that. By the Court: Don't interfere, Mr. Brewer."

The witness stated that he had not seen either Joe or John Kizer that day.

The statements of the witness on cross-examination are substantially the same as the direct examination.

Mrs. Sally Swink, wife of Jordan Swink, testifying for the state, stated: At the time of her husband's death they were living about three miles southeast of Swink.

"We lived there about nine years. The morning before he was killed that night, my husband went to Paris, Tex., leaving about 9 o'clock in the morning, I imagine. When he left home, Sam Johnson was with him. He left in a Chevrolet sedan, tudor. Sam Johnson was the only one with him when he left for Paris, Tex., that morning. I knew Joe Kizer at the time he left. Jordan came back about four-thirty, and John Kizer had gone to his house, I think. He left our house. Joe had been working for my husband in the hay barn. After my husband and Sam Johnson returned from Paris, my husband left again, taking our little boy and girl with him. Albert was about 14 years old; the little girl was about three. My husband left, saying that he was going to Idabel. Joe came to our house, he told me. By Mr. Brewer: If the Court please, I know that we both, in this matter, tend to be leading and suggestive. I think you ought to let the witness detail it. By Mr. Welch: I started to ask what he said, and there are a lot of things that might not be material. I don't mind. He said he was going down to the house and be back after awhile. I don't know exactly how far he lived, about a half mile; I am not sure. By a juror: Pardon me, explain which way it lies."

The witness explained the location of the different parties' homes on the map.

"The Kizer house is about a quarter north of the highway. It must be about a half mile. I know where the Slaton Store is. The Slaton Store must be about a mile east of the county line, between Choctaw and McCurtain counties. When my husband returned from Paris, he brought something in the house and asked me what groceries we needed. My husband had a pistol about the house. It was a German Luger, I guess, that is what they call it. It was in the house. After my husband left, Joe came to the house. That night Joe and Johnnie came, Johnnie came in the house; Joe, he went towards the hay barn and when the car drove back, the boys here got out and came in the house. It was not long until another car drove up. They got up and went out to that car. His brother, John, came into the house first. They came to the house in a car. Came to the house in Joe's car. We were talking about Albert. He had a heart attack the day before. By Mr. Brewer: We object as incompetent, irrelevant, and immaterial. A. You asked what the conversation was. By the Court: You asked for the conversation. By Mr. Brewer: No, I did not, if the Court please. By the Court: You said to let her tell it. By Mr. Brewer: I understand, but I object to anything that is incompetent, irrelevant, and immaterial. By Mr. Welch: Mr. Brewer, I can ask her about that point or let her tell it. Which way do you want it? By Mr. Brewer: I am not going to object to any testimony except incompetent testimony. I think the witness should tell what is competent and relevant. By Mr. Welch: She doesn't know. By Mr. Brewer: Then I make my objection. By the Court: All but what you want left out, that is about the boy having a heart attack? By Mr. Brewer: Yes, sir. By the Court: Well, the jury is admonished not to consider the part about the boy having a heart attack.

"John talked about his little brother being sick. There was nothing said about my husband, Jordan Swink. The next time I saw Joe, after he left my house the first time, was when he was running Albert. He never came to the house after he shot Jordan. He went to the hay barn, and John came into the house before Jordan came home in the evening. Joe came in the house. He never said a word; just walked around the house. When this car came up, they walked out. Joe first, and John walked out later. It was Nathaniel Woodley's

car, a pick-up truck. Our house faces south. When the Kizer boys walked out of the house, when the Woodley car drove up, I stayed in the house a few minutes; then walked out on the porch, and sat down in the swing. I didn't try to see what they were doing. I had an idea. After that my husband came. I saw the lights of his car coming up the road. He turned his lights off when he got on the top of the hill, and drove on to the house. Those boys shot him. I saw them when they walked up to the car. It is hard to tell just how it happened. When the car stopped, those two boys walked up to the side of the car; and the next thing I knew, they were shooting. There were quite a few shots. Seems like I counted about five. It was beginning to get dark. They walked up to the left hand side of the car. My husband was driving the car. I could hear some talk, but I do not know just exactly what it was. It was so quick; he had hardly stopped the car; and the shooting took place. After the shooting I heard a scuffling like on the gravel, and I heard the little girl cry. I ran out when I heard the shooting to see what was the matter; just as I got near the gate, my little boy ran past me; and I heard somebody holler, 'Stop.' It was Joe hollering, 'Stop'; and the next thing I seen, he had the gun. It was a sawed-off shotgun, and looked to me like something about that long (indicating). It looked like a shotgun, with the handle sawed off or something. I had seen the gun before, and I knew it. I had seen it in the smokehouse in Joe's things. The boy ran toward me, and Joe hollered, 'Stop.' I ran up to him, and began screaming: 'Joe, don't shoot that boy. Don't do that.' By Mr. Brewer: We object to this testimony. It was after the other offense had been committed. By the Court: It is so closely connected, it may be admitted. By Mr. Brewer: Give us an exception. We object for the reason that it shows to be an offense that would prejudice the jury. We take the exception. By the Court: Overruled."

Mrs. Swink continued:

"He was running this boy with that gun, and I begged him not to shoot him. He went back to his car. Johnnie was there; and he shoved Johnnie in; and he got in on the driver's side and drove off. That is the last time I saw either of them that night. I could not tell which one did the shooting. Both Joe and Johnnie were on the driver's side when the shooting began. Joe Kizer had been working with my husband. He wasn't working for him; he was in with him. They were

partners. I don't remember whether Joe came to the house the first time before my husband had returned from Paris, Tex., and left again or not. Joe left my house before night; and it was getting dark when he came back. Johnnie was in the house about the time the announcer over the radio announced 7:15. Joe had gone toward the barn. He was not up to the barn very long—maybe ten or fifteen minutes. He came from the barn in his car, and parked it facing the highway. He got out and came in the house. Just a few minutes after he came in, the first car drove up. About ten minutes after the first car drove up, Jordan came. The barn is north and west of the house. The garage opens into the driveway. The road that goes to the barn comes in between the house and the garage. There is a gateway there, and Joe in going to the barn went through that gateway. When he came back from the barn, he stopped his car right in the gateway. When my husband drove up and stopped, Joe's car and his car were ten or twelve feet apart. I did not see my son before he started running towards the house. I did not pay any attention. When I first got off the porch, the little girl was on the gravel and was crying. I had seen that sawed-off shotgun one time before the night of the killing."

On cross-examination the witness stated:

"The evening of the killing, Johnnie Kizer was in the house. I was just visiting with him. Joe had gone to the barn, where he and Jordan had a still together. I knew that Joe and Jordan were partners, because Joe stayed at the house so much of the time. I have heard them talking about it. When the truck drove up, I did not know who it was. The boys came in the car that the Kizer family use all the time. I heard Joe say it was his car. I heard the car come back from towards the barn; and Joe came in the house. I don't know what they were doing in the garage. I could hear their noise, but could not tell what they were doing. The radio was still running. It was a short while after the pick-up drove up that the other car came. I do not know whether they were still working in the garage or not when my husband drove up. I was sitting on the porch when I heard the shots. I ran off the porch into the yard. My husband drove up without his car lights. I didn't hear my husband say, 'Come here. What have you got in that car?' I was not listening; did not think of this trouble. I couldn't understand anything. There wasn't much said; I don't know just exactly how far it

is from the porch to where Jordan stopped his car. It is just a board fence around the yard. While I was sitting on the porch, the first thing that attracted my attention was the firing of the shots. I had not paid any attention to what was going on prior to that time. I saw these two boys before the shots were fired. They walked up to the car, to his side; they went to shooting. He had hardly got his car stopped when they walked up. And they went to shooting. There might have been a word spoken; I could not make out any words. If anything was said, it was said before these shots were fired. They were shooting inside the car, so quick that when I got hold of myself, I could hear the shooting. I could not believe they were shooting him. I could not swear which one was doing the shooting or how many. I could see both Joe's and Johnnie's bulk on the left-hand side of the car. I did not see Joe Kizer back up towards the front. Nor did I see Joe before the shooting back away from the car. I did not see my husband reach for anything in the car. He did not have anything in the car. I knew his gun was at home, but I did not know exactly where it was. By Mr. Welch: Is this argument with her? By Mr. Brewer: I rather think the witness is arguing with me, but I beg your pardon. A. I am answering you. By Mr. Welch: Go ahead and answer the questions. By Mr. Brewer: You may address the Court as well as I. Q. You didn't know where it was, but you knew it was there? A. I knew the gun was in there somewhere. My son, Albert, had it that night when I saw it. Q. You were quite excited, weren't you? A. Would you be? By Mr. Welch: Just answer the question. A. I wasn't excited; I was killed myself. By Mr. Brewer: We ask that remark to be stricken. By Mr. Welch: He asked that. A. That is not a fair question. Suppose somebody shot your wife, how would you feel? By Mr. Brewer: If the Court please, we ask to have a mistrial if they keep that up. I am as courteous as I know. By the Court: Answer the question. A. What did you ask me? You asked was I excited? Q. Yes, ma'am. A. Yes. I said I was hurt, of course, I was; and it unnerved me. Q. Can you answer the question yes or no? By Mr. Welch: I believe she has answered it. A. I answered it."

Mrs. Swink continued:

"When I went towards the car, the little boy came by me, and ran around the house to the east end of the house. I saw the defendant. He hollered to my little boy to stop. I was on the inside of the fence, and he was on the other—the

board fence between us. That was the first time that I saw the shotgun that night. I had seen the shotgun before. When I saw the shotgun prior to the night of the killing, it was in the smoke-house in his belongings. It was Joe that was following the boy, and had the sawed-off shotgun. Nathaniel Woodley was inside the garage at the time. I did not see him until it was over, and I asked him to send for help. I knew my husband's signature, I think you showed that to me before. If my husband wrote it, he certainly did not write his name right. J-o-u-r-d-a-n is not the way he spells his name. The signature you showed me is his handwriting, if it is not forged. I do not know any Mr. M. D. Emerson's signature. I never saw him write anything in my life. By Mr. Brewer: All right, just trying to identify it. By the Court: To show that it is competent? By Mr. Brewer: I have not offered it in evidence. I am trying to identify it. I did that before. By Mr. Welch: Go ahead and examine the witness. By Mr. Brewer: We object to the counsel's attitude and remark. By the Court: And he objects to yours, and you both should quiet down, and let us try the lawsuit. By Mr. Brewer: I was not addressing him. I am trying to do my duty by this young man. By the Court: Are you talking to the witness? By Mr. Brewer: No, sir. By the Court: Go ahead and cross-examine her. By Mr. Brewer: Mrs. Swink, after this happened, these boys got in the car and drove off? A. After they killed him. I left my place and went for help, and when I got back, Jordan's brothers were there. It was sometime after that before the officers got there. By Mr. Welch: If the Court please, we desire to offer in evidence what has been marked state's Exhibit One."

Exhibit 1 related to the witness Merle Slaton, who had a regular subpoena in the John and Joe Kizer case, and had been discharged at the last term of court, that John Kizer was tried separately at the last term of court, and the Joe Kizer case continued.

"By Mr. Brewer: We object to all of it, and except. By Mr. Welch: You don't deny that you asked that the hearing be had out of the presence of the jury? By Mr. Brewer: No, but we object to the use of the subpoena to show that process was issued in October and being used for attendance now. By Mr. Welch: We offer in evidence state's Exhibit One, that is the original subpoena. By Mr. Brewer: It is in the record already."

State's Exhibit 1, so received in evidence, appears herein on page 8.

"By Mr. Welch: I was sworn yesterday."

Mr. Hal Welch, special prosecutor, testified that in the trial of the case of John Kizer, at the last term of court, Merle Slaton appeared as a witness in that case, and that she testified.

On cross-examination he stated:

"I don't think she was discharged. Q. You have seen the discharge? A. No, I did not see the discharge. I did not look at it. I saw you introduce it in evidence, but I don't think that is a discharge."

Cap Duncan stated that he was sheriff of Choctaw county.

"At the request of Mr. Gross, the county attorney, I made an effort to obtain the attendance of Mrs. Merle Slaton on the court. I went to where they live, and her husband told me she was visiting some of his folks near Horatio, Ark. He said she had been gone since last Saturday a week ago. I went over there and talked with her. I had a subpoena for her, issued by the clerk of this court. I asked her to come back, and testify, and offered to bring her back. She had not been subpoenaed this time. She said she had rather not come back. I tried to get her to come, and she wouldn't come. She was in the state of Arkansas. That was yesterday. There was placed in my hands yesterday, the day this case was called to trial, a subpoena for Merle Slaton to appear in this trial of Joe Kizer. Her home is in the state of Oklahoma, and she lives over the edge of McCurtain county. She said she was not quite ready to come back at this time. By Mr. Brewer: Is it admitted that no process was issued for this sitting of the court? By Mr. Welch: It will be admitted that by inadvertence the name of Mrs. Merle Slaton was omitted from the list of witnesses for the trial of this case that was issued on the 24th day of March, 1937. By Mr. Brewer: We object to the inadvertence. We don't know why it was left off. By Mr. Welch: I don't think it makes any difference, it was left off. By the Court: Overruled. We will allow you an exception. By Mr. Welch: Is that all you want in the record? By Mr. Brewer: That is it. By Mr. Brewer: Comes now the de-

fendant at this time, and because of the insufficiency of the showing made, objects to the use of any transcript of the testimony of this witness, or testimony heretofore given, and demands her personal attendance."

The state offered the testimony of Merle Slaton taken before T. W. Hunter, county judge, on the defendant's application for bail before the Criminal Court of Appeals of the state of Oklahoma.

"By Mr. Brewer: The defendant renews his objection for the reason no proper diligence is shown to have her here, and no showing made that she could not be produced at some later day. By the Court: Overruled. Exception allowed. The transcript will be admitted in evidence."

The defendant objected to the introduction of the transcript of Merle Slaton, taken before County Judge Hunter, for the reason that there had been no diligence shown, and that it was incompetent, irrelevant, and immaterial, and that the testimony related to something Johnnie Kizer did, and not this defendant.

"By the Court: Objections overruled, and exceptions."

The transcript of Merle Slaton's testimony was read by the prosecution.

"My name is Merle Slaton. I live two and one-half miles west of Valliant. That is about a mile and a half east of the Choctaw county line. I know Joe and Johnnie Kizer. We live one and one-half miles west and one-fourth mile north of the county line. Q. Do you remember the evening when Jordan Swink was killed? A. Yes. Q. Did you see Joe Kizer or Johnnie Kizer that evening?"

The defendant objected so far as it goes to Johnnie Kizer, on the ground that it is incompetent, irrelevant, and immaterial, and the act of some person other than the defendant.

"By the Court: Overruled. By Mr. Brewer: Exception. A. I saw Johnnie that night. Q. About what time? A. About dark. I did not look at the clock. Q. Early? A. Not real early. Q. Where did you see him? A. At the store. Q. You are living there? A. Yes. Q. Did Johnnie Kizer come into the store?

By Mr. Brewer: We object to anything Johnnie did. By the Court: Overruled. Exception. A. Yes, sir. Q. Do you know how he came to the store? A. In a car. Q. Where did the car stop? A. In front of the store. Q. Was any one else in the car? A. I don't know. Q. Did you hear the car drive up? A. Yes, sir, the car did drive up. Q. What did he say? A. He stood around for awhile and asked for some shells. Q. What kind of shells? A. Shotgun shells. Q. Did he ask for any particular kind of shells? A. No, just shells. Q. Did he tell you what size of shells? A. I don't remember. Q. Did you sell him some? A. Yes, sir. Q. How many? A. Three. Q. You remember what kind of shells he asked for? A. No. Q. That was the same evening Jordan Swink was killed? A. Yes, sir. By Mr. Brewer: It was late? A. Yes, sir, late. By Mr. Brewer: It says 'later.' By Mr. Welch: No, your own copy has been corrected. It is your own copy that you submitted. By Mr. Brewer: I didn't submit it. It is 'later.' The question and answer were 'later.' By Mr. Welch: No, it follows the question. By Mr. Brewer: We will show it to the jury."

Sally Buchanan:

"My name is Sally Buchanan. I know Joe Kizer. I know his father Bill Kizer, and his brother John. They live north of me in a field, a little over a quarter of a mile. Q. North of the highway? A. Yes. Q. That is the highway leading from Hugo down the state, down into McCurtain county? A. It was a highway, but it is changed now. At the time Mr. Swink was killed, it was the highway."

Sally Buchanan continued:

"I live south of the highway, right on the highway. On the evening, along about dusk, I saw Mr. Kizer's car pass. It was later that I saw Joe. He was crawling through the fence in front of my house. He ran, but not fast, and kind of ran across the field home. He was crawling through the fence, just a little to the left of my house. Just before I saw Joe, I saw the car. I could not tell how many people were in it. I did not notice. I did not hear a car come out from the Kizer house, but two went towards the house. After Mr. Swink was killed, Mrs. Swink came to my house. It was a long time after I saw Joe going across the field to his home before Mrs. Swink came to my house."

On cross-examination Mrs. Buchanan stated that the Kizer boys cut across that field quite often in going home.

It was not unusual for them to do so. "He wasn't running fast, but walked fast. No, kind of a run. He got there by the time the car did. The car had to go around north and back, and he went across the field, and got there by the time the car did."

On cross-examination the witness stated that the Kizer car passed just before Joe came along. "It was going up the road, but had not turned in when I saw it. The car went around the road, and Joe went through the field, up to the house."

Richard Wilson, testifying on behalf of the state, in substance stated: "My name is Richard Wilson. I was deputy sheriff at the time Jordan Swink was killed. I heard Joe Kizer testify in the John Kizer case.

"Q. I will ask you if he stated anything in that testimony with reference to meeting his brother at his home and leaving there? By Mr. Brewer: To which we object. That isn't the best evidence of this boy's testimony. It would be the transcript of the record. By Mr. Welch: We would be glad to introduce a transcript of the evidence, if you will agree, and not object. By Mr. Brewer: If the Court please, I would have to see what portion. By Mr. Welch: The only reason that I am doing this, you heard the testimony yourself, his name is endorsed on the information, and if the defendant wants to have the transcript of the entire testimony introduced in evidence we will offer it. By Mr. Brewer: We object to his making parol testimony out of something that has been taken in writing. By Mr. Welch: Will you agree to its introduction? By Mr. Brewer: If you will get the part you want to introduce and let me compare it, I will. This is parol evidence of something that is in the record, and is in properly. I don't know what purpose it could serve at this time. We think it is out of order, and there is no impeachment now that is proper. By Mr. Welch: We have the notes of the reporter who took his testimony at the former trial, and that will be available if the man says that it is not true. He can controvert it for his defense in this case. I am going to offer all his testimony, or the notes if you agree that Mr. Snead may read the part that I want; and the only reason I am doing that is Mr. Snead's name is not on the information, and we cannot use him as a witness. I think we can use a man

whose name is on the information to comply with the law. If you waive it, I will offer it. By Mr. Brewer: I won't waive it without knowing. You say you have the record? Let me see it. By Mr. Welch: I don't have the record. Mr. Snead will have to read it. By Mr. Brewer: Let's have him read it, and let's see. By Mr. Welch: Why not have him read it to the jury? By Mr. Brewer: No, I want to see it before. By Mr. Welch: His testimony is proper, unless he wants to quibble. By Mr. Brewer: I don't want to quibble, I want to object to your remark. By the Court: Overruled, and if it does not refer to something in the case, and is not proper, the court will instruct the jury not to consider it. By Mr. Brewer: We except. We specifically except because it is an attempt to use parol evidence, when there is a written statement, and the prosecution knew, and could, more than three days prior to this trial, have endorsed the name of Mr. Snead if they were going to use the evidence, and they have not done it, and are doing indirectly what the law says you cannot do directly. By the Court: Overruled, exception allowed. By Mr. Gross: This is for the purpose of proving this statement of the defendant, and any statement he made is subject to proof anywhere, if he makes it, whether in court or out. By the Witness: Joe said after he left the Swink house, he went on down the highway a piece, and went across the field, and on home. About that time his father and brother reached him, and they stayed there about five minutes, and then they returned back to the Swink's. By Mr. Brewer: Just a minute, you want to refresh his memory or let him tell in that connection? By Mr. Welch: Wait until I say it, and see. By Mr. Brewer: I object to your leading and suggestive question. By the Court: I can't tell yet. By Mr. Brewer: But the question he asked was leading and suggestive. I let it go in without objection for the reason I thought he was entitled to show a connection with the testimony he wanted. Now let him testify what the boy said as he remembers it. By the Court: Overruled. By Mr. Brewer: Exception. By Mr. Welch: You ask him the question. By Mr. Brewer: No, he is your witness. If the court please, I want to object and ask for a mistrial, because of the special prosecutor's conduct in making remarks, and not addressing them to the court which I think is prejudicial in this case. By the Court: Overruled. By Mr. Brewer: Exception. By the Court: Proceed. By Mr. Welch: Richard, did he make any statement as to where the car went, and where he and his brother John were after they left the house? By Mr. Brewer: We object as

34

leading and suggestive. By the Court: Overruled. By Mr. Brewer: Exception. A. He said he and John went in the car, and John was driving the car, and they were together from the time they reached home until they left, and John got in the car and drove it, and he was with him, and they went back towards Swink's. Q. Was he questioned as to whether or not they went to the Slaton's store? A. Yes, sir. By Mr. Brewer: That is leading and suggestive. Let him tell what he remembers. By the Court: Overruled. Exception allowed. By Mr. Welch: What was the question? Read the question. By the Reporter: Was he questioned as to whether or not they went to the Slaton's store? A. Yes, he said they did not. Q. He said they did not? A. Yes, sir. Q. But did he say they were together continually from the time he left the house until they went to Swink's house? A. Yes, sir. Q. He did say they went to the store after the affair was over, didn't he? One or both of them? A. One did, I wouldn't say which one. Q. And that was after the tragedy, later? He said that, didn't he? A. I wouldn't say for sure. It seems like one of them did. Q. You can't remember that, but you remember what Mr. Welch asked you? A. Well, I refreshed my memory on this particular part." Witness excused.

Albert Swink, testifying for the state, in substance, stated:

"My name is Albert Swink. I am 15 years of age. Jordan, or J. W. Swink, was my father. My father was killed on the 29th of April. I did not attend school that day. I don't know what time my father left that morning. It must have been about 3 or 4 o'clock when they returned in the afternoon. Sam Johnson was with him. He had a coat in the car. He put the coat in the house; took the back seat out and carried it into the house. I asked him if I could go, and he said I did not have any heart. By Mr. Brewer: That is incompetent, irrelevant and immaterial. By Mr. Welch: We withdraw it. By Mr. Brewer: And ask for a mistrial for the reason that it was intentionally injected into this case to prejudice the jury and is prejudicial to the defendant's rights. By the Court: Overruled. By Mr. Brewer: Exception. Q. Did you, Mr. Brewer, if you don't want me to ask him, I am not going to ask him the questions. By Mr. Brewer: If the court please, I object to the counsel's remarks and I think it is highly improper, and ask for a mistrial on account of the conduct and side statements of counsel. A. We left the house

and went to Idabel, me and daddy and Sam. Sam got out at Valliant. My little sister, about three or four years old, went with us. When we got back from Idabel, we drove back to the house. Must have been about 7:30 or 8 o'clock, something like that, when we returned. It was after dark. When we drove up to the house, daddy cut the lights off before we got home. He drove up into the driveway. When he drove in, he did not have time to stop. Joe and John Kizer came out to the car * * * the defendant Joe Kizer and his brother. Joe is the oldest. Q. This defendant? A. Yes. When they came up to the car, Joe was the first to walk up. Daddy said, 'Howdy' or 'Hello, boys.' Joe walked up and said, 'You s——b——, you have been telling lies on me,' and when he said that he kind of backed up. Johnnie come around and went to shooting. Daddy says, 'Oh boys, don't do that,' and that is all he ever said. Daddy was sitting in the driver's seat, and Retha was in the middle, and I was on the far side. When they went to shooting, I pulled Retha down under the seat, kind of on the floor, and got down as fast as I could, and in a little while Johnnie walked around to the side of the car. I was trying to get out. Johnnie got me by the arm, never said anything. As soon as I got half way around the car he said, 'You have been telling lies on me.' "

The defendant objects to what Johnnie Kizer said unless this defendant was there.

" By the Court: Overruled. Q. Go ahead."

The witness continued:

"I tried to get him to let me stop, and put Retha down, and he wouldn't. I dropped her on the gravel, and then I went around the car with him. When we got near the car door, I jerked loose and ran between Joe and Johnnie. Joe took after me, and ran me to the gate. I run around the house and behind the barn. I thought they were after me. I lay down in a ditch, and I happened to think. I went back to the house; all the lights were burning. I went to get the gun, and it wasn't loaded. Daddy gave me the shells a few nights before. I asked for the shells. I went in the house and got the gun, a German Luger pistol. Joe Kizer had a sawed-off shotgun. It was an outfit about that long (indicating) with a barrel on it, and the shotgun stock had been whittled off, and it was a little bitty outfit, looked like a straight stick on it. I had seen it before in the smoke-house on the fruit jars and

things. Part of Joe's things were on the east side of the smoke-house, and that gun was laying on the west side on something. I saw the gun in Joe's hands after the shooting."

The defendant objects to any testimony with reference to the gun and what was done with it after the shooting, if the witness did not see it before the crime was committed.

Objection was overruled and exception saved.

Albert Swink continued:

"Joe came up to the side of the car first. He kinda' stepped back a little, and Johnnie walked up around to the right and went to shooting. They were on the left hand side of the car."

The witness explained the position of the cars at the time of the shooting.

On cross-examination the witness stated that he went with his father to Idabel, and the witness was asked if his daddy got some whisky there. It was objected to as incompetent, irrelevant, and immaterial.

"By Mr. Brewer: We want to show his condition. By Mr. Welch: But you have no right to kill a man on account of his condition. By Mr. Brewer: It is cross-examination, and I want to show where they went, and what they did. By Mr. Welch: We object as incompetent, irrelevant, and immaterial. By the Court: Sustained, exception allowed."

The witness answered:

"When we went to Idabel, I was not with my father all the time. When we drove up to our home, I was in the car with my father. I went in the house and got the pistol. I did not get the pistol in the car when my father drove up. I ran in and loaded the pistol. I put in six shells. I knew how to handle it. The shells were on the chiffonier when I went in the house to get the gun. My father had given me the shells the night before. When we drove up, my father did not say, 'Come here, boys', or 'Hello', but 'Howdy, boys.' Q. You don't know whether he said 'Come here' or not? You wouldn't tell the jury he didn't say that? By Mr. Welch: Wait and let

him have time. By Mr. Brewer: I am giving him time. Q. But he was the first one who spoke, wasn't he? A. Yes, sir. Q. When he spoke to the boys, they came toward the car, didn't they? A. They were walking up to the car when he spoke. When he walked up to the car, the defendant did not do anything but tell daddy he had been telling lies on him. He kind of stepped back a little. Q. I will ask you whether or not in the preliminary trial this question was asked and answered: 'Q. What was Joe doing at that time? A. I couldn't tell what he was doing. He stepped back a distance towards the front of the car.' A. I didn't say he stepped clear back to the front. Q. How far did he go back? By Mr. Welch: If the court please, that is confusing and improper cross-examination for a witness of this age. By Mr. Brewer: If the Court please, we object to the counsel's remark. Q. This boy was moving back when the gun was shot? A. He had moved back. Q. This defendant did not do any shooting? A. No, sir. Q. When he walked up you didn't see any gun in his hand? A. I didn't see any gun. The defendant did not take hold of me when I got out of the car. Q. You had the pistol in your hand, picked it up off the floor and ran around the house with it? A. No sir, do you think I would have let him do that and have a pistol there? Q. You visited Kizer's house before that? A. I visited— Q. I thought you said— By the Court: You asked him a question, and did not give him time to answer it. By Mr. Brewer: I thought he said, 'Yes.' By the Court: What was your answer? A. Yes. By Mr. Brewer: I thought you said, 'Yes.' Q. And it was on the wall that you saw this shotgun, that you ever saw it? A. No. I never did see it at the house. I saw it at my house. I know it is Joe's; I saw him with it at the barn. It was in the smoke-house among his things. Q. Did you see this 38 automatic your daddy shot Fat Williams with? By Mr. Welch: We object as incompetent, irrelevant, and immaterial. By the Court: Sustained. That does not go into this case. By Mr. Brewer: All right, exception. Q. You had seen your daddy with a 38 automatic in addition to the German Luger, hadn't you? A. No, sir. By Mr. Welch: That is immaterial. If he had had it, didn't give them the right to kill him. By the Court: You ought to lay some foundation. Your question is objectionable and sustained. By Mr. Brewer: I will ask you this question and answer from the preliminary trial. Q. 'He stepped back', referring to Joe, 'He didn't have a thing to do with the shooting, did he?' A. 'No, sir, the only thing, he just tried to catch me.' A. He tried to

catch me. That was my answer in the preliminary examination."

The witness continued:

"I did not run and get a gun. It was after dark when we drove up to the house. We cut our lights off before we got to the house. The boy got pretty close to me after it was all over, as he was running after me. He did not get hold of me. Johnnie was shooting with his right hand. Joe had the shotgun in his right hand. I don't know when he got the shotgun. By Mr. Welch: I think he is arguing with him. We object to the argument. By Mr. Brewer: I am asking him. Q. You could not see it when he walked up? A. No sir. I did not notice it in particular. I wasn't figuring anything would happen. I did not notice it just exactly. By Mr. Brewer: There is no use for voluntary statements. By the Court: That is what I think, if you will ask the questions, and let him answer. By Mr. Brewer: They don't answer, they are not responsive. By the Court: You don't give him a chance. By Mr. Brewer: But I don't want voluntary statements, just to answer the questions is what I am getting at. By the Court: Q. Was it double barrel or single barrel? A. Single barrel. By the Court: The question was asked in your examination in the examining trial before Judge Hunter, referring to what this boy had. 'Q. What was it? A. Looked like a big shotgun, something.' Q. Was that your answer? A. I didn't say a big shotgun, did I? Q. You don't deny you made the answer? By Mr. Welch: It wasn't correct if it was. A. I didn't make the answer. Q. There hadn't been any trouble? A. No, I don't reckon. Johnnie Kizer had been staying at the house part of the time at night while daddy was in Paris, Tex. By Mr. Welch: You drown out the answer before he gets through. By Mr. Brewer: I wish you would address your remarks to the court. By the Court: Proceed with your cross-examination, Mr. Brewer. A. Johnnie Kizer stayed around our home at different times, and come to the house."

On redirect examination:

"Q. Albert, which one of them was it that said something about you had been lying or telling lies on me? A. Joe. Q. Was that before or after your daddy says, 'Boys, don't do that.'? A. That was before. Q. What was the last thing your daddy said? A. 'Oh, boys, don't do that.' "

On re-cross-examination:

"Q. At that time this boy backed up, and wasn't doing anything, was he? A. No, sir."

After the state rested its case, the following conversation back and forth between counsel for defendant and the state is as follows:

"By Mr. Brewer: The state doesn't offer Mr. Duncan? By Mr. Welch: The state offers now to make Cap Duncan a state's witness, and let the defendant ask him any questions he wants to. If Mr. Duncan is not here, we will get him up here. By Mr. Brewer: I thought they were going to put him on the stand. I want to ask him— By Mr. Welch: We will put him on the stand. You may ask him anything. By Mr. Brewer: You have rested. By the Court: He rested, and you asked if they were going to put on Cap Duncan. By Mr. Brewer: Yes, sir, I want to ask him, I want to talk to him. By the Court: He offers to put him on, and let you cross-examine him. Do you want to? By Mr. Brewer: If he wants to put him on, that is his case. By Mr. Welch: We don't want to put him on, but we will put him on to accommodate you."

The defendant then moved the court to dismiss its cause and discharge the defendant, and direct the verdict of not guilty for the reason that the testimony against the defendant as produced by the state is wholly insufficient to show the defendant guilty as charged.

Motion was overruled, and exception allowed.

Mrs. Swink, recalled for further cross-examination, stated:

"I am the same Mrs. Swink that testified before now. It was a good little bit after that before any one came to the house. I could not say exactly. It must have been about 7:45. I heard the announcer say it was 7:45 when we were sitting in the room. Q. Was that question asked, and was that your answer? A. To what? By Mr. Welch: By way of explanation, he is asking about your testimony in the preliminary hearing, the first preliminary hearing in this case. A. Well, I believe it was 7:45, that is 15 minutes until 8. That is what the announcer on the radio said when I was sitting in the room. I had visited the Kizer home lots of times. I did not see the sawed-off shotgun at their home."

40

On redirect examination she stated:

"I did not know whether the announcer over the radio was saying to tune in on a certain night or that he was giving the time. That was my statement. You know, I believe it was 7:45 instead of 7:15. I am not positive as to the time of that program. After that it was a good little time before anyone came back to the house. Q. You made this answer at the time, didn't you? A. I said it just like Hal said it. By Mr. Welch: If you don't remember what you said— A. I remember, but he can't let me explain. Come up close enough and explain it, and I will talk to you. Listen, let me tell you. Q. You are pretty good, aren't you, at asking questions? By Mr. Welch: Talk louder. By Mr. Brewer: I think she hears it. Do you all hear? By a Juror: You all conglomerate it up. I can hear it, but that way I can't understand. By Mr. Brewer: I am asking if on the preliminary examination, when you testified before, if the question was asked, and if you made this answer? You may answer yes or no. Q. 'How long was it after that before any one came back to the house?' A. 'A good little bit. I can't say exactly. It must have been something like 7:45. I heard the announcer say it was 7:45, when we were sitting in the front room.' Q. Did you or did you not make that answer at that time, when the radio was going? Just answer the question. By Mr. Brewer: I am asking it for the purpose of impeachment. The court understands. Was that question asked, and did you make that answer? By Mr. Welch: We object to the interference with the witness in making any answer she wants to make. He asked her one question out of a whole line of testimony without going into the background, and I think she should be permitted to explain what she was talking about. By the Court: He is asking that question for the purpose of impeachment of your testimony if he could. He asks you at this time if that is the statement you made. By Mr. Brewer: I ask you at this time, if that is the statement that you made? A. Well, it was, I— By Mr. Welch: Answer yes or no. By the Court: Was that the answer to the question he read? A. I never did understand it. By Mr. Brewer: Yes, Mr. Welch questioned you and asked you, 'How long * * *' By Mr. Welch: Are you going to testify? By Mr. Brewer: Do you want me to fix it for her? Mr. Welch was questioning her. By Mr. Welch: I don't care who was questioning her."

Albert Swink was recalled for further re-cross-examination.

"Q. You were down at Mrs. Buchanan's. Where did you go after this happened? A. Johnny Hamilton's. Q. And at that time you had the German Luger? A. Yes."

On redirect examination:

"By Mr. Welch: Q. What did you have the pistol for? A. I just had it. Q. Why did you get it? A. Because I wanted to carry it."

The witness continued:

"I thought maybe we might need it; the boys and I just got it. I was afraid to go alone. I had not had the pistol that day before my daddy was shot. That night when I went in the house and loaded the pistol, I mashed my finger on my left hand. I did not show that to any officer that night, but I mentioned it the next morning. I told about that in the presence of the officers the next morning. I pinched my finger. It was in the house after the shooting. By Mr. Brewer: As a matter of fact, you picked the pistol up in the car, and ran around the house, and hid it down yonder? A. No, sir."

Cap Duncan, called on behalf of the defendant, stated:

"I was sheriff of Choctaw county last April, 1936. I know Johnnie Kizer. I was called back to the office; Johnnie Kizer was at the sheriff's office when I got there. He voluntarily surrendered to me. I went and made an investigation of the killing. I saw Jordan Swink's car. There were six sacks of sugar with a blanket spread over them in the back of the car. There was either a half pint or a pint bottle in the car with a little whisky in it. Jordan Swink was dead at the time I saw him."

On cross-examination the witness stated:

"Jordan Swink's body was in the car, with his head lying back like that (indicating); his left hand by the side of his leg, between his leg and the floor of the car; his right hand lying down; I don't remember whether it was on the right leg or the left leg. He was dead at the time. I found these empty shells on the ground on the west side of the car. They were within eight or ten feet of the car. I found three that night. Later Richard Wilson found one more. The shells were 380, which is a fraction smaller than a 38 caliber pistol. I went in the house and found a German Automatic Luger. It was in a dresser drawer."

"By Mr. Welch: It is all right to ask him if he had a conversation? By Mr. Brewer: All they are doing, they want to keep some evidence of some kind. By the Court: That is improper, whether or not it is evidence. By Mr. Brewer: Maybe that would be; I might question him about what was said."

The court admonished the jury that the intimation had been made of suppressing evidence from the sheriff, and that they were instructed not to consider that for any purpose until it was proven.

"By Mr. Brewer: I did not mean to leave that inference. By the Court: But you did. By Mr. Brewer: I want to ask him whether he did take some papers, and they demanded it, or what that conversation was. By the Witness: Do you want me to answer? Q. Yes, sir. A. Mrs. Bert Swink, when I was searching him I took some papers, a little book and some money off of him, and Mrs. Bert Swink said, 'I think you ought to leave those with the family. They are personal effects and I think you ought to leave that with the family.' Q. What were those papers? By Mr. Welch: That is immaterial, if the Court please. By the Court: If they were personal effects, you have a right to state before the jury."

A conference was held with the court, out of the hearing of the jury, after which proceedings were had as follows:

"By Mr. Brewer: I will make the offer. We offer to show that these were papers where he purchased this sugar, and the place where he purchased, etc. By the Court: Offer refused and exception allowed."

On cross-examination the witness stated:

"I didn't have any trouble. Mrs. Bert Swink was there. She is the wife of the brother of Jordan Swink. The only thing we talked about was leaving some papers with the family, instead of me taking them. This was after Jordan Swink's body had been taken in the house, and placed on the bed. I went through his pockets completely. I did not find any evidence of any weapon on him. I didn't count the money, so I don't know how much he had. I counted what I got out of one pocket."

Nathaniel Woodley, testifying for the defendant, stated:

"My name is Nathaniel Woodley. I remember the night Jordan Swink lost his life. I was there at that time. I had a load of fruit jars at the time. I drove into the garage, and these Kizer boys came to me after I came to the garage. I learned afterwards it was them. They helped me unload the fruit jars, and walked out to the front. About that time Mr. Swink drove up. They helped me unload the fruit jars. I saw a fellow that I remember was Johnnie Kizer, who used both hands in helping unload the fruit jars. He did not have any shotgun in his hand at the time he was helping unload the jars. These two boys walked out of the garage ahead of me, and I followed. I stopped at the front of Mr. Kizer's car. They walked out to Mr. Swink's car. When Mr. Swink drove up, he said, 'Howdy, gents', or something like that. I did not understand what he said. I heard everything they said at that time. I was standing with my foot hung over the front bumper of Mr. Kizer's car. I turned my head off. I did not see them when they finished going up to the car. They were still ahead of me when they turned off. They did not stop at the car where I was. The next thing I knew, I heard voices. I looked towards Mr. Swink's car. I didn't hear what was said. It was probably two or three minutes between the time they went towards the Swink car before the shooting began. I could hear the voices, but I did not pay any attention to what was said. That was two or three minutes before they walked out."

"By Mr. Welch: Let him testify to that. By Mr. Brewer: He has already testified to it. By the Court: I am trying to let him tell it. By Mr. Welch: Let him tell it, and Mr. Brewer keep quiet. By Mr. Brewer: How long was it before you looked again? By Mr. Welch: If the Court please, let him tell it. By the Court: Go ahead, Mr. Witness, the stenographer is all right."

The witness continued:

"After one shot was fired, it seemed like it was a second or two, and four more; and between the first shot and the last four, I turned and looked at Mr. Swink's car. I saw what I taken to be a bulk, one on one side, and a bulk on the other. I turned and ran back in the garage, behind my truck, and couldn't see anything. When I came back to the front of the car, somebody from behind Mr. Swink's car ran towards the house. No one followed the figure that I saw run towards the house. When this boy came around the car and ran towards

the house, seems like a minute or two, and somebody hollered, 'Let's go.' I don't know where the voice materialized from. It happened so quick I could not tell. They got in their car and left; and after they left, I went towards Mr. Swink's car. After the shooting ceased, and the boys left, Mrs. Swink came to the car where I was, about the time I got to the car. The only figure I saw going towards the Swink house was this figure going towards the house, and around the house. I couldn't tell how large he was. A little girl came from around the car, looked at me, and fell down, and went to crying back of the car. Neither of the boys had a weapon that I could see when they got into their car. I got to Mr. Swink's car about the same time Mrs. Swink did; I did not see any gun or weapon of any kind in the car or near the car. I was not watching either of them to see what they did. When the shooting started, I went back into the garage; and after the shooting stopped, I came out again. When I came out the last time, it was when I saw the fellow running towards the house. When I heard the first shot and looked towards the car, I could not tell which one of them it was, or whether both were standing there. I don't know which one it was that said, 'Let's go.' I had not seen Mrs. Swink before the defendant left the scene of the trouble. After one of them said, 'Let's go', and they left, Mrs. Swink and I met at Mr. Swink's car. I didn't hear Mr. Swink say, 'Boys, don't do that.' He said, 'Howdy Gents.' That was the only thing I remember. When I got over to the house, the garage, to unload the jars, I asked if they knew where Mr. Swink was, and one of them told me he had gone to Idabel. Said they were expecting him back shortly."

Johnnie Kizer, testifying for the defendant Joe Kizer, stated:

"I am the brother of Joe Kizer. I recall the tragedy that ended in the death of Jordan Swink. When I got home that afternoon from Hugo, it was about dusky dark. My brother came up. Jordan Swink owed me some money. My brother told me that Jordan wanted to see me. I got in the car with my brother Joe, and drove to Mr. Swink's home. Joe went to the barn. I went in the house, and sat down; and a car drove up. My brother came back from the barn, and drove up near the house, and stopped. There was nothing of any interest went on in the house; just went in and sat down and talked to Mrs. Swink and the children. When this car drove up, I went out. It was a boy driving the car from Fort Towson,

with some fruit jars. He drove in the car shed, and we helped him unload the fruit jars. About the time we got through unloading them, Jordan Swink drove up. All three of us were in the front of the garage. We walked out. The Woodley boy didn't go any further than the door. My brother was a little in front of me. We walked up to the car, and Jordan Swink asked what we had in the car. Kind of cursed, and said, 'God damn you, what have you in the car?'. My brother was up towards the front, even with the windshield. He ran back and threw up his hands. I heard a pistol; and I don't remember whether I put my hand in my pocket or already had hold of the pistol, but I came out with the pistol; I already seen the gun, and it excited me. I was going to make him drop the gun. I was shooting at his hand. He tried to come up again. I shot until the gun quit. I went around the car. I was not expecting any trouble when Jordan Swink drove up. I got the gun I had—my brother had some bedding in the barn, and said, 'Let's take the back seat out,' and when I got out the back part where you latch it, the gun fell out, and I picked it up, and put it in my pocket. I had seen Jordan Swink with this gun prior to this time. He had been in the car, and drove it sometimes, just like one of the family. The car belonged to the Kizer family. When the shooting was over, there was a little boy and girl in the car. The gun dropped, and I was scared the little boy would pick it up. I walked around the car. He was getting out. I got hold of him; he had the little girl, and was trying to hide something behind the little girl someway. He said, 'Let me set the baby down,' and dropped her; didn't hurt the baby, and walked around the car. He jerked loose from me, and ran toward the house; so I jumped in the car, and said, 'Let's get away from here.' My brother got in the right hand side of the car; I was driving. We drove down there about three-quarters of a mile, where the lane goes to our house. I told my brother, 'I expect I had better go to the store and get some shotgun shells. The other brothers of that man may come down, and we may have trouble; they might come to the house.' Joe said he was going to the house. I drove to the store, and bought some ten gauge shotgun shells. We had a ten gauge shotgun at the house. It was an old ten gauge double barreled shotgun. I drove back to the house, and tried to find where my father was. My mother told me she thought he would be in soon. Joe went to hunt for him, and got back in the car and pulled out. I don't know whether Joe saw him; but in a little while he came in with Mr. Cooper, and a fellow

named Crabtree, and a man by the name of Wilson. I then came to Hugo and surrendered to the sheriff. I had no knowledge that we were going to have any trouble when I went to Jordan Swink's house. My brother didn't know I had the pistol. Joe didn't have any weapon. If there was any sawed-off shotgun in our car that night, I didn't see it. I shot Jordan Swink to keep him from shooting me. I had worked for him, and I had quit. I am 20 years old—19 at the time of the trouble. Jordan Swink was 40 years old, I would judge. When Jordan was in jail in Texas his wife came and wanted me to help run the still. I went up there for awhile to help her run the still, while he was in jail. I decided there wasn't anything to it; and after Jordan returned from Texas, I decided to quit. One Sunday afternoon he picked me up as I was coming from the Water Mill Church, and asked me if I wanted to go to Idabel. He was pretty drunk, and kind of threatened to kill me, because I quit. By Mr. Brewer: Before this time, did you know of occasions of him having some fights? By Mr. Gross: If the Court please, that is leading. Let him tell it or try. By Mr. Brewer: I am not. I am asking if he knew of violent acts Jordan Swink had done. By Mr. Gross: Let him tell it. By the Court: Go ahead and make your statement. A. Yes, sir, I heard of right smart trouble he had. Q. Had he told you about it? A. Yes, sir, he told me of some."

The witness stated that Swink had some trouble with a man named Landtroop. He did not know what they had trouble about.

"He had trouble with Coleman Lick; tried to cut Coleman Lick, and might have cut him; tried to cut him, and Coleman run from him. He hit old man Reeves in the head, drew a pocket knife and juggled him, kicked him around and knocked him down, and kicked him in the head. He hit Lee Powers with a stick of stove wood and bunged him up. Q. Anybody else? A. Yes, he killed Fat Williams in Texas. I knew he killed a fellow. He told me about it. Q. Did he tell you he made a written confession to the county attorney? By Mr. Gross: If the Court please, that is leading. By the Court: That is. I don't know that you can go any further than to say he knew he killed Fat Williams. By Mr. Brewer: We want to offer this in evidence. He says he told him he made a confession. I think we have a right to offer it in evidence, signed by him before Grady Sturgeon. By Mr. Gross: That is incompetent, irrelevant, and immaterial. By Mr. Brewer:

I think it shows the manner in which it was done. By Mr. Welch: Are we going to try him for killing Fat Williams? By Mr. Brewer: No, we are not, but we want to show what this boy knew. By the Court: If he knows or heard of acts of violence on the part of the deceased, it would make no difference whether he saw it or not. If it made an impression on his mind, that is all the effect it could have. It would not make any difference whether it had been proven, but if he just heard it. By Mr. Brewer: We withdraw it if it is immaterial. Q. Any one else? A. Not that I think of."

The witness continued:

"I know where the Water Mill is. He tried to make a gun play on a fellow named Bud Crabtree, the deputy sheriff there. I had heard of that before this trouble. Q. I will ask you if you know of any threats made against any other members of your family? By Mr. Gross: Leading and suggestive. A. Yes, he threatened my daddy. By the Court: You knew about that? A. Yes, sir. Q. Detail who was present when that took place. A. Well, a fellow named Bridges and some other guy. Q. Is that the Mr. Bridges who is on the jury and a witness? A. Yes, sir. Q. Did you ever know of him using shotguns? A. I know he carried a pistol. By Mr. Gross: That is suggestive. By the Court: It is very suggestive. Q. Do you know whether or not he had a shotgun? A. Yes, sir, he had a shotgun. Q. Do you know Frank Osborn? A. Yes, sir."

The witness stated further:

"I had heard of a good many he had had trouble with; and I mentioned the ones, or most of those, I heard he had trouble with. The trouble I heard he had with different parties influenced me to want to get away from his work."

On cross-examination the witness stated:

"I found that pistol in the back seat of our car. Going up, Joe said to get his quilts and bedding. I didn't know what was in the back end of the car until we got the back seat up; and I found this pistol. After I came back from the little store, Joe took the car and drove off. He drove the car to Jordan Swink's house. After we left Jordan Swink's house, I let Joe out and he went on up to our home. I drove on down and got the shotgun shells. There were fruit jar cases in the back of the car; but I don't know whether they had whisky in them or not. I had the pistol in my right

front pocket. I had not told Joe about finding it. I had not used an automatic pistol prior to this night. I don't know whether it was on safety or not; nor do I know whether it was loaded; I never looked. I pulled it out and tried to shoot Jordan's pistol out of his hand. I didn't run when I saw Jordan had a pistol in his hand. I started shooting at him. I don't think he shot at me; he was trying to. I don't know how many times I shot him. By Mr. Welch: Get your chair straight like the seat of that car would be; maybe you had better turn the other way for the jury. Get square, and show us. By Mr. Brewer: Court please, I don't think that is proper, I don't care about making an objection. By Mr. Welch: If you don't care, then sit down. A. He was in the car sitting— By Mr. Brewer: And we object also because it couldn't be fair. By the Court: Well, sit down then. By Mr. Brewer: I think we want to object, because it is not regular. By the Court: Overruled. By Mr. Brewer: All right, exception. By Mr. Welch: Demonstrate what he did. A. He was trying to come up with his gun (indicating), both hands, and come around this way."

The witness continued:

"I don't know where I shot him first. I was shooting at his hand. I don't know whether his legs were crossed or not. I was standing about even with Jordan Swink, where the door opens. I don't know when I shot him in the left shoulder. The first thing Mr. Swink said when I came up was, 'Come here'; and the next thing he said was, 'What in the God-damned hell have you got in that car?' or something like that. I did not hear him say, 'Howdy, gents.' My daddy owned a sawed-off shotgun about three years ago, the past winter. He went with a fellow named Frank Blackard to rabbit hunt. The fellow had a hack saw, and daddy said something about sawing the gun off to pack it on a saddle. I had not seen the gun for sometime; and I had heard my father say he lost the gun. It was a twelve gauge. It was something like that in length (indicating), something like about two feet. The handle had been sawed off, and the barrel had been sawed off. It was sawed off so that my father could carry it on a saddle. Father lost it three, four, or five months before we had trouble. I did not see the sawed-off shotgun that night. No, I was not mad at Mr. Swink. I liked him. I did not know that he was mad at me about anything, but the way he did me on the road. He kind of cursed me around and had a gun; had a Luger, it looked like, some kind of gun. He didn't point it

at me, but had it in his hand. He cursed me, because I had quit working up to his place. His actions scared me. This was after church in the evening. It happened while we were going to Idabel, 20 or 22 miles away. It was about dark then. No one else was with us. Mr. Swink had two pistols. Sometimes he carried one, and sometimes the other. He carried them in his pocket, and in his belt, anywhere he wanted to stick them. I had been to Hugo the day Jordan Swink was killed. I came over there in the morning pretty early. I did not deliver any whisky while I was in Hugo. Aubrey Herrington and daddy were in the car with me. We returned straight home, and got there about dark. My father had some business there, and I came with him. I talked to Mrs. Prince. We sat in the car, and I talked with her. She is a woman who lives close to where we do. As we went home, we stopped at Sawyer to get some gasoline or oil. We stayed just long enough to get what we wanted. At that time, I did not know that I would see Jordan Swink that night. About the time we got home, Joe came up from across the field. No, sir, it was dark. He might have driven up and come to the car. I didn't know where Jordan Swink was. I didn't hear any one tell Woodley that Jordan had gone to Idabel, and would be back soon. I was waiting to see him to get some money. I had known him eight or nine years. I had worked for him about a month. I don't know how long Joe worked for him. He worked before I did, three or four months, something like that. No, sir, I didn't know Joe had gone to the barn and loaded the whisky. I knew he went to the barn, he said, to get quilts and bedding. I don't know about any shed that Joe had something in; nor do I know about his having a sawed-off shotgun up there. I bought the ten gauge shotgun shells from the Slaton store. Seems like I bought them from a woman, Merle Slaton. I think her husband's name is Lisha. There are twins, Lish and Lige, and I get them mixed. I was excited and scared when I bought the shotgun shells. I went and bought the shells; run in and bought them, and run back to the car. By Mr. Brewer: You say you went in and bought the shells? You just walked in and bought them, and you didn't know how long you were there? By Mr. Welch: Oh, now. By Mr. Brewer: You said he run, you used the word 'run'. By Mr. Gross: He said he did run, and you said he didn't. By Mr. Brewer: Q. Did you run or walk? A. I could walk fast enough; just walked in. Q. You didn't run out; you walked out? By Mr. Gross: If the Court please, he said he didn't, and that settles it. By

the Court: Don't argue with each other. By Mr. Gross: I am talking to the Court now. Q. This boy didn't have anything to do with that shooting, did he? A. No, sir, he didn't. Q. And didn't know it was going on until it happened? A. No, sir, he didn't. Q. Johnnie, I overlooked one. Do you know Mack Woolsey? A. Yes, sir. Q. Do you know about Jordan Swink making some kind of knife play at him? A. I heard about it. By Mr. Gross: Court please, that is leading. By Mr. Welch: We object to defendant's counsel making such statements. By the Court: Let him tell it. By Mr. Brewer: He remembered and told me, it isn't my fault. If the Court please, let Mr. Welch address the Court. By Mr. Welch: We object to defendant's counsel making such statements. By the Court: Go ahead and ask him. Q. He asked you about buying the shells. When you bought them, did Mrs. Slaton know the difference between shotgun shells? A. No, sir, she just had some shells in a box. And I picked out number ten shotgun shells."

On re-cross-examination of the witness:

"Yes, sir, I am positive I got ten gauge shotgun shells. The sawed-off shotgun was a number twelve gauge. I have never been convicted or served a term. By Mr. Welch: I was inquiring about a liquor charge, served on a liquor charge. A. Yes, sir."

Counsel conferred with the court out of the hearing of the jury and the court reporter, after which proceeds were had as follows:

"By the Court: Gentlemen of the Jury, there has been some testimony here as to the trial of Johnnie Kizer. For the benefit of the jury I admonish you that it has nothing to do with the case. A severance was taken, and Johnnie Kizer's case has been tried, and his case is on appeal. This is by agreement of the parties. That you not consider in this case."

Witness excused.

Mack Woolsey, testifying for the defendant, stated:

"I knew Jordan Swink in his lifetime. The time I had a difficulty with him was about some whisky. By Mr. Welch: I think that is improper. By Mr. Gross: If he wants to go into the whisky business, we are ready to go."

Neal Mabry, called as a witness for the defendant, stated:

"I knew Jordan Swink in his lifetime; I knew an officer by the name of Bud Crabtree. By Mr. Gross: You are leading him. By Mr. Brewer: Go ahead and tell it. By Mr. Welch: I don't think that proof is admissible. If he wants to show a difficulty between Jordan Swink and Crabtree that would be admissible. I don't think he is entitled to show the facts of a difficulty. We cannot try and determine whether or not Jordan Swink was justifiable in it or whether he was wrong. We should withdraw any objection to asking if there was a difficulty. By Mr. Gross: No, that is right. By Mr. Brewer: Court please, I think we have a right to show violence used on the part of Jordan Swink, and stop with that. By the Court: You want the testimony to go in that there was a violent act on the part of Jordan Swink? By Mr. Brewer: I don't think we get it, if we don't show what it was. By the Court: The testimony of Johnnie Kizer was as to various acts of violence that he heard about making an impression on his mind, that it made him in a certain state of fear of Jordan Swink. To go into each one of these acts of violence to try Jordan Swink's case, whether justifiable, would not be right in the trial of this case. By Mr. Brewer: But we want to show what it was, and that he had a weapon. By Mr. Gross: He got that from Johnnie Kizer. By Mr. Brewer: But I want to show that it happened. By the Court: It might be admissible to show that it was an act of violence for the purpose of corroborating the witness Johnnie Kizer. I will permit it that far."

The witness continued:

"I was at a dance at the Water Mill that night, and while I was there they had a fight, two boys had a fight, Bill Meggs and Bill Calfee, the best I remember. Crabtree was deputy sheriff, and he arrested them, or attempted to, but it seems that Mr. Swink thought that Crabtree was showing favoritism to the boys, and I am under that impression. I did not see any act. When I walked up Mr. Swink had a gun in his hand, and Mr. Crabtree was almost by him. We were about ten steps away from him and west, when the moon flashed on a gun, and I grabbed Mr. Swink's hand. Q. What, did you grab his hand? By Mr. Welch: We object to that. A. He told me to mind my own business, and to give him credit for having some judgment. Q. The pistol was pointed

at Mr. Crabtree? By Mr. Welch: We object. By Mr. Brewer: I am trying to get the facts. By the Court: That doesn't make any difference. By Mr. Brewer: You don't want me to go into that? By the Court: No, that shows his acts of violence."

Neal Mabry, Leonard White, Elmer Bridges, Coleman Lick, Frank Blackard, and Thad Landtroop were all called to show the disposition of the deceased; and all testified as to having had trouble with him.

Bill Kizer, the father of the defendant, testified that on the day of the killing that night he was in Hugo, and that Joe Kizer went with him.

"Jordan Swink got mad at me one time, because I would not support the man for county commissioner he wanted me to support; and he got mad at me, and tried to get me out of the car so that he could whip me. By Mr. Welch: We move that this be stricken as immaterial. By Mr. Brewer: I think a threat against a member of the family ought to be gone into. By the Court: I don't know whether that is an act of violence or not. By Mr. Brewer: It is a threat. We can show threats against members of the family. By Mr. Welch: We are powerless to defend against any accusations of that kind."

Bill Kizer further stated that he at one time owned a sawed-off shotgun, and lost it when he was wolf hunting in February or March before the killing in April.

"When I owned the gun, anybody could see it hanging on the wall in my home. The evening of the killing, Bob Cooper and Bud Crabtree, friends of mine from East Texas, who were fox hunters, were at my house. They wanted me to go with them to Wright City to look for a dog that Crabtree had lost."

On cross-examination the witness stated:

"Jordan Swink was killed on the night of the 29th of April, 1936, as I remember. I lost the sawed-off shotgun in February or March of 1936. I carried it wolf hunting to shoot wolves. The boys never did say anything to me about Jordan mistreating them."

On further cross-examination the witness was asked:

"Q. You have been convicted of a felony; served a term in the penitentiary? A. No, sir. Q. You have not? A. No. I have not been convicted of anything. Q. Did you plead guilty? A. No, sir. By Mr. Brewer: Unless the prosecution has evidence, I think that is ground for a mistrial. I think it is prejudicial conduct. By the Court: I think the prosecution has the right to question the witness whether he had been convicted."

Exception is allowed.

Joe Kizer, the defendant, testifying in his own behalf, stated:

"I am the defendant in this case. I live with my parents about a quarter of a mile west of the Choctaw county line. I know Johnnie Kizer; he is my brother. I knew Jordan Swink in his life time. I made whisky for him the day before he was killed that night. I was working for a percentage. The more I cooked, the more I got. The only whisky I ever made was for Jordan Swink. By Mr. Welch: Just a minute. We are unable to controvert that proposition, and we don't think it is material. If we had a fair chance to join issue we wouldn't object. By the Court: I don't think it is material. By Mr. Brewer: They have gone into what business arrangements they had. By Mr. Gross: If the Court please, he brought that out. By Mr. Brewer: No, Mr. Welch brought it out from Mrs. Sallie Swink when she was first on the stand, and said they were partners. By the Court: But if they were partners, that would not be justifiable. By Mr. Brewer: No, but the point is we want to show the dealings and relationship between the parties. Q. I will ask you when did he first come to you about this? By Mr. Welch: If the Court please, that is the same thing. By the Court: You ask him when he first came to him? By Mr. Brewer: Q. How old were you when it first happened? By the Court: Sustained. A. I was 20 years old. By Mr. Brewer: Don't answer when the Court sustains an objection."

The witness stated that Jordan Swink hired him at first for $4 per day.

"By Mr. Welch: We won't object with the understanding that we can go fully into it. By Mr. Gross: Fully into the whisky business. By Mr. Brewer: That is right. By Mr. Gross: We want it all in."

The witness continued:

"I had never had any trouble with Jordan Swink in my life. He told me about killing Fatty Williams, and laughed about it. By Mr. Welch: We think that statement is wholly improper, and not responsive to the question, and the jury should be admonished not to consider it. By Mr. Brewer: Court please, he had a right to show what he knew about it."

Quite a controversy went on then between Mr. Brewer and the court as to the admissibility of certain testimony relating to what the deceased said about killing Fat Williams.

"By Mr. Welch: If the Court please, a man cannot claim he had nothing to do with killing a man, and then say he was justifiable. By Mr. Brewer: We object to counsel's statement. We state we didn't have, but his brother was justifiable. We are not trying his brother who said he had something to do with it. By the Court: What is his defense? By Mr. Brewer: Our defense naturally in this case is that— By the Court: He didn't? By Mr. Brewer: This boy didn't have— By Mr. Gross: Then he would have no right to show it. By Mr. Brewer: He has a right to show the condition and situation under which his brother acted. That is competent to show that this boy was justifiable in whatever he did or did not do. He didn't do anything; but they said he did."

The witness further stated:

"I think Fat Williams was killed in January; and I worked until the 29th day of April. I had in view going to the oil fields to work. I was aiming to quit working for Jordan Swink. I saw the pistol that Johnnie turned over to the officers. Jordan had it at one time. I did not know where it was the night before the shooting took place. That morning I got up, fired up, and worked until night. I got through; all the beer was done; I run it, and got through; then I went down by the house like I usually do. I would go by, if I was going off, and tell them, so they would know. In this whisky business, you know, they wanted to know where a fellow was. I walked through the house and said, 'I am going home a little while, Mrs. Swink.' She was lying on a cot. I took a drink of water and some matches to light a cigarette, and

walked out and down the highway. I had a 1936 Ford V8, new car, Tudor coach. I had made the first payment on the car, and got in a tight, and couldn't make the other payments; and mamma and daddy made the payments. It belonged to all of us. I went through the field as usual, like Mrs. Buchanan claims she saw me that afternoon. I went across in a fast walk, might have struck a trot once in awhile; nothing unusual when I walk, and did that merely for exercise. I went on home. There was some fellows there. I believe they got in about the same time, papa, brother, and my sister, and old man George Cooper, and Bud Crabtree, and Walter Williams in another car, I believe were at the house. Johnnie drove back down east about 100 yards from the house to the lane, and then drove up to Mr. Swink's home. When we got to the house, I told Johnnie to get out. He got out and went in the house; and I went up and got some stuff, and put twelve cases and two gallons and a half of whisky in the car. I turned and drove back to the house. My brother Johnnie had gone with me; I told him that Jordan said he wanted to see him. I was not expecting any trouble. I had khaki trousers and khaki shirt, and of course in working in beer, it got the beer like candied sugar, gluey stuff; I took a razor blade and cut the sleeves off next to the shoulder to get the beer and stuff off the arms. I didn't have any gun. When Nathaniel Woodley from Fort Towson came with the load of fruit jars, we helped unload them. I did not have any weapon about me, in my clothes, not even a pocketknife. When we got through unloading the stuff in the building, we walked to the door which faces southeast, and a car drove up. We walked out close to him, and he said, 'What's that you got in that car, God damn you.' I didn't say anything. He said 'God damn you, what's that you got in the car?' He was drinking. I could tell; I had been around him a lot. When he would be drinking he would go, 'Hum, hum,' a habit. He reached to the pocket of the car. A bright gun kind of flashed in sight, and I threw up my left hand and run, retreated back kind of towards the back of my own car. My car was in front of his car, the windshield part and the door were between him and me. I did not have any weapon when I walked up, and Jordan flashed the gun; I backed off. By Mr. Gross: Court please, that is suggestive. By Mr. Brewer: He said he did. By the

Court: But there is no use to emphasize it until you get to the argument. By Mr. Brewer: I wanted to let the jury get that, just how it happened. By the Court: I know, but you emphasize it in the argument. By Mr. Brewer: I beg the Court's pardon, I didn't mean to do it. I wanted to fix the time he backed off. Q. Now, what happened then? A. Well, the gun went to shooting. Q. Did you know what gun it was? A. No, it shot one time and just a roar; I couldn't tell one shot from another. Shot one time, and a little time, then big. Q. When that was over what did you do? A. John turned around and walked off; retreated, then taken steps back from the car."

The witness continued:

"There was somebody in the car seat of Jordan's car. Johnnie went around the car; I believe to the back and opened up the door. I heard him saying something, but couldn't tell what. After awhile he said—, Johnnie come back, and the kid either turned him loose or something, and the kid run toward the house, between the two cars. I did not have a weapon at that time. Johnnie went back and got in the car, and said, 'Come on, let's go.' He really said, 'Let's get away.' I did not have a weapon of any kind that night; nor did I know that Johnnie had one. We had not expected trouble of any kind. I had nothing whatever to do with the tragedy. I had been there all the time; I had not stayed at home for a week; I had stayed right there."

On cross-examination the witness stated:

"I made the down payment on the car. From what Mr. Swink had said about Johnnie coming up that night, I got the impression he wanted to pay Johnnie what he owed him. I had had no trouble with him. I had got whisky there before. He had not told me to get the whisky, because it was my whisky. I worked for a percentage of the whisky. I would take the whisky off and sell it. He didn't have to tell me to take the whisky; I had taken it before."

"By Mr. Brewer: Answer the question whether he told about this specific whisky? A. He never told me to take that whisky."

The witness further testified:

"There was some left in the barn. I took all but a part of a case. We did not expect to have any trouble about Johnnie getting his money, as he had always paid. I did not take a sawed-off shotgun with me; nor did I have the sawed-off shotgun at the shed, or in the car that night. Sam Hall helped me load the whisky at the barn. I didn't tell Sam Hall anything. I didn't tell him he had better get away, that there was liable to be trouble when Jordan came. I came back home the 29th day of July, 1935 and went up and went to work for Jordan, and worked with him until the time of the killing. I never saw the sawed-off shotgun hanging on the wall. I didn't see the car that night that father, brother, and the other parties were driving, until I got up to my home. I had seen this automatic pistol that Johnnie had; it belonged to Jordan Swink. I don't know just how long it took me to load the whisky. I took about twelve or fifteen minutes, I would judge, to load the stuff in the car. There were twelve cases and two gallons and a half. There were six gallons in a case. You can hold big loads in the car. Jordan and I had fixed it so that we could get more room by lifting out the back seat. I am four years older than Johnnie. We had a ten-gauge shotgun that belonged to our grandfather at our house, an old double-barreled ten-gauge Remington. I served a year and a day for whisky. I got caught in front of Jordan Swink's house at one of his stills. I was with my brother John from the time our car left home until we got up at Jordan Swink's. I retreated backwards toward our car; I couldn't tell you just what directions. I was scared. Albert, when he got loose from Johnnie, went towards the house, just a fast trot, you might call it. I saw the little girl after we got in our car. She was in the rear of Jordan's car. I know where Mr. Swink went every evening—to Idabel to get his sugar. I quit work that evening between sundown and dark. I told Johnnie the night he went up with me to Jordan's place that Jordan said for him to come there, that he wanted to see him. I stayed at the barn there the night before the trouble the next night."

On redirect examination:

"Johnnie drove the car, and let me out near our home. I run up to the house, up the lane. Johnnie drove on to the store east, to Slaton's. Q. That was after the tragedy? A. Yes, sir."

The witness continued:

"It wasn't but a little bit until he came back. I left. I got in the car and took the whisky up the road, pushed it off in a bar ditch in a dump, and went on after my daddy."

On re-cross-examination:

"By Mr. Welch: Why did you get out of the car and go to the house? A. To talk to my mother about what happened."

The witness testified further:

"Johnnie said he was going to the store to get some shotgun shells. He was scared of the Swinks. He knew they had a bunch of brothers, and all that had not been killed, had killed somebody. They were dangerous people. We knew the Swinks would get word and would hurt us, if they got where they could. I got out of the car, because I wanted to go and tell my mother, and change my clothes, so they would know. She was bawling, and Johnnie came back in the car, and asked where daddy was. She said that he went off with those guys; that they went over about Wright City after a dog. I had heard about the shooting William Swink was in. I heard about the cousin and uncle shooting a negro; and the negro killed two and turned and run. By Mr. Welch: If the Court please, we object. We move the Court to instruct the jury to disregard Mr. Brewer's statement concerning any other Swinks being killed. By Mr. Brewer: Yet, it is what you brought out. By the Court: The jury is instructed to disregard the statements made by either side that was not testified from this stand about who got killed and how and where. By Mr. Brewer: I thank you. I think that is right."

The witness was then asked if he knew Jordan Swink's signature, and there was considerable argument back and forth between the lawyers and the court as to the offer of a statement which purported to be a signed confession that Jordan Swink made to the officers at Paris, Tex., as to his killing Fat Williams. The offer was refused, and the defendant saved an exception.

Cooney Caldwell, testifying for the defendant, stated:

"Jordan Swink had two pistols. One was a Luger, and the other an automatic. The size of the automatic was 380. I saw him have it up at Antlers. He had these pistols sometime after the alleged killing of Fatty Williams."

On cross-examination the witness stated that he had never seen the sawed-off shotgun. The witness was asked that if in the application for bail before Judge Hunter he gave the following answers to the following questions:

"Did he tell you he had a sawed-off shotgun? A. Yes, sir, he told me he had one: Q. Did he describe it? A. No. Q. But he told you that? A. Yes. Q. When was the last time you had a conversation with him about it? A. No conversation about it. Q. When was that? A. At the cafe. Q. You were working at the cafe or pig stand? A. Yes, sir. Q. Did you give those answers to those questions? A. Yes, sir."

On redirect examination the witness stated:

"He was talking about one, some of them had. By Mr. Brewer: Did he say it was his? A. He didn't say whose it was, but he said he had one."

Bob Cooper, testifying for the defendant, stated:

"I know Bill Kizer. I remember seeing a sawed-off shotgun Bill Kizer had. It was something like 20 inches or two feet in length. He hunted with me in the winter of 1936."

On cross-examination the witness stated that he did not sign the defendant's bail or any of the Kizer family's bail.

E. J. Slaton (known as Lige) testified that he lived west of Valliant about three miles. He was not at home the evening of the tragedy.

"I went to put out my fish hooks about dark, and neither Johnnie nor Joe Kizer came to my place before that, that evening. When I returned there were cars passing all the time, probably there would have been some there. When I got back to the store sometime between 9 and 10 o'clock— it was after nine; and I had promised my wife I would be back at nine, and she was romping on me because I did not. The most shells I had were 12 gauge in the store to sell. That is what I had invoiced to me, and about all I bought. Q. Was that a ten gauge shell? By Mr. Gross: Now, if the Court please, he is leading, he ought to be fined. Why didn't he ask him if it was a twenty gauge? Q. Was it a 20 gauge? By Mr. Gross: A lawyer who violates the Court's rules ought to be fined. By the Court: I will try to take care of

this end of it. Go ahead and answer. A. I could not say what kind, just an old shell; I couldn't testify what it was."

A number of witnesses testified as to the reputation of Jordan Swink in the neighborhood as to being a quarrelsome man.

Johnnie Kizer was recalled for further cross-examination, and stated that at the Jordan Swink house that night, he had the pistol in his front pocket.

"I had the pistol in my front pocket all the time I was in Jordan Swink's house that night. I never thought anything about telling Mrs. Swink that I had Jordan's pistol, that I had found."

Nathaniel Woodley was called for re-cross-examination, and was asked if in the testimony at the hearing the following questions were not asked, and the answers given:

"Q. You never had got in your truck? A. No, sir. I was still at the front of my truck. Q. Did you see or hear anything after that? A. I heard one of the fellows say, 'I will learn you to threaten me.' Q. Did you give that answer? A. Yes. Q. One of the two fellows said, 'I will learn you to threaten me'? A. Yes. Q. Did he say anything else? A. Yes, sir. Q. What was that? A. Shall I tell them in court? Q. Yes. A. Said, 'You son of a bitch, I will learn you to threaten me.' By Mr. Brewer: We object to those because it is not proper at this time, and unless it is identified as to what two men, what somebody else said, wouldn't be competent. By the Court: Overruled. By Mr. Brewer: Exception. Q. Did they say that out at the car? A. Yes, sir. One of the two men said, 'I will learn you to threaten me.' I don't believe I did. If I did, I don't remember it. Q. But you did hear someone there say, 'I will learn you to threaten me'? A. Yes, sir. Q. Was that the same voice that said, 'You son of a bitch, I will learn you to threaten me'?"

The witness continued:

"Those two questions were together. It was the same thing, at the same time, I couldn't identify who said it. It could have been Mr. Swink, and could have been one of the two boys. I didn't know the boys who helped me unload the fruit jars. I had known Mr. Swink a short time.

I couldn't say whose voice it was. I had seen the automatic pistol that Johnnie had that night, before a number of places. I never did carry it myself. It did not belong to me. There were two pistols at the pig stand the night the Holton boy was injured. I never had a pistol. They had them at the pig stand, the boys that run it. Q. You say you boys working had two automatics? A. Pistols. They were out there. Q. Where were they kept? A. Under the counter."

The witness stated that he did not have either one of them that night.

"The Luger is the one I suppose he had the night of the killing. I never packed a gun. He was in the habit of carrying that 380 automatic."

On redirect examination the defendant stated that he did not make any such statement as testified to by the witness, "I will learn you to threaten me." Nor did he make any statement like that. "I backed off when the trouble began, and didn't hear anything said. I was backing up to try to get to the front of Jordan's car. I got back about even with my car."

Sam Johnson, testifying on behalf of the state in rebuttal, stated:

"I left Jordan Swink about 5 o'clock in the afternoon at Valliant, Oklahoma. I don't know what he had or did in Valliant or Idabel, or in going to and from."

Albert Swink, called in rebuttal, stated that his father, when they got ready to leave Idabel, brought a half pint of whisky to the car, and that he took one or two drinks between there and home. The bottle was about half full when they got home.

John Snelling, called in rebuttal for the state, testified that he was 23 years of age.

"I lived with old man Holton out west of town. The only time I met the defendant was that one time. By Mr. Welch: Where was it you met him? A. At the pigstand.

Q. Did he have any weapon of any kind at that time? A. I didn't see any. Q. You didn't see any? A. No."

Katherine Harris, called on behalf of the state in rebuttal, testified that she knew Joe Kizer. She had known him since January 1, 1936.

"I worked as a waitress at the Monterey Club. Joe was working there. During that time I saw the defendant have an automatic pistol. He carried an automatic in his pocket. I never did see him without it but once during the time we were working out there. He had this automatic pistol and another gun. I don't know what kind the other gun was. It was about this long (indicating), and had a kind of a pistol grab hold. That is all I can say. The barrel seemed to be about that large (indicating). It was at night when I saw it. That was the only time I ever saw that gun. I saw him carry a little black automatic pistol. It was about the last of February, on a Monday when he carried me home from Mrs. Swink's. I was at the pigstand the night of the trouble with the Holton boy. The defendant used this automatic on the boy's head."

On cross-examination the witness stated positively that Joe Kizer was working at the Monterey Club in January. The witness insisted that she had seen Joe Kizer with a gun around the pigstand.

"Q. You stayed at the Swink home awhile with Mrs. Swink, didn't you? A. Yes, sir. Q. And had a little trouble with her, and she threatened to send you to the asylum? Hasn't a complaint been made against you for your sanity? By Mr. Brewer: I asked if she had had a sanity hearing. By Mr. Gross: That hasn't a thing to do with it. By the Court: I don't think so. By Mr. Brewer: We seek to show her interest and mental ability, if the Court please. By Mr. Gross: If she has been convicted, I haven't a word to say. By Mr. Brewer: That is all right. Q. Are you married? A. Yes, sir. Q. When did you marry? By. Mr. Gross: That is immaterial, incompetent, irrelevant, for any purpose; doesn't show who killed the man. By Mr. Brewer: But I have a right to show the interest of the witness, the moral conditions and surroundings in which she lived, courts have held— By Mr. Gross: No, they haven't. You get the book, and I will

eat it. By Mr. Brewer: All right. We offer to cross-examine this witness to lay a foundation to impeach her; to show that she became pregnant with child before she was married; and the further question, we lay the predicate for impeachment that her mental condition had been the subject of inquiry in her family, and others with whom she had been associated. By the Court: The offer is refused, and exception is allowed. Q. Catherine, you say who was with you, Cooney Caldwell, and who were in the car? A. When? Q. When you saw the short gun with the big barrel. By the Court: She didn't say a sawed-off shotgun, and the jury is admonished that there is no testimony showing that there was a sawed-off shotgun in the car. By Mr. Brewer: I appreciate that fact, too, Court please. I think that the testimony should be stricken as incompetent, irrelevant, and immaterial. By the Court: She said there was a gun, but not a sawed-off shotgun. By Mr. Brewer: But it is to impeach the defendant that it was a sawed-off shotgun. We move to strike the evidence. By the Court: Overruled. By Mr. Brewer: And exception allowed. Q. Where did you leave that evening you got with the boy? A. He was working out there."

The witness stated:

"I left with him to go down the road, and when we came to the hotel he said he wanted to talk to me. I got him at the pigstand where we worked. It was three days after the tragedy happened in Texas."

William Swink, called in rebuttal for the state, testified that he was a brother of Jordan Swink, and that he lived in Hugo, Okla., at the time he testified.

"I have known the defendant probably all his life. I know the defendant carried an automatic pistol. The pistol he carried resembles the one presented here in appearance. I have seen it around my house when the defendant slept there, when he began working at the pigstand. I have seen it at the pigstand, and I have seen it in his automobile. My brother's pistol was a Luger. I did not know of him having any other pistol. I have seen the defendant with what is called a sawed-off shotgun. He was at my house a year ago the past Christmas, and had it in his automobile. It seemed to be an ordinary

shotgun with a barrel sawed off close to where the end would be, and just a home-made handle. Did not stick out like an ordinary shotgun stock, but curved down like it might have been whittled out of wood."

On cross-examination the witness stated:

"I happened to be out there the night the Holton boy had trouble. Jordan bought the pigstand, but I don't think he stayed there regularly. I saw the sawed-off shotgun in the door in the car. The door was open. It was Christmas morning, 1935, a year ago last Christmas. Q. You know that a 380 automatic like this was brought by Jordan to your house, and put under the pillow of the bed after the difficulty in Texas, don't you? A. No, sir. Q. There was one under there, wasn't there? A. But it was not this gun."

Sam Hall, called in rebuttal on behalf of the state, stated that in helping the defendant Joe Kizer making whisky at Jordan Swink's place, that Joe left the evening of the killing about sundown and said he would be back in a few minutes; and asked the witness to stay until he came back.

"He came back when it was getting dark and said, 'Let's get this whisky out.' We loaded in 15 cases of whisky and two gallons. One half gallon was all that was left. Q. After the whisky was loaded in the car what, if anything, did Joe say to you? A. He told me, says, 'Now, if Jordan Swink says anything to me about this whisky I am going to shoot him half in two.' He said, 'Shut the doors, and you better get out of there.'"

The witness continued:

"He got in the car and left; and I shut the doors and left. I was not there when the shooting happened. I saw his sawed-off shotgun in the car that Joe had, just a little thing about that long (indicating). I had seen it once before laying on the box in the barn, and Mr. Swink had told him that he did not need that thing. Jordan come in the barn, and told him he did not need that, and to do something with it. It disappeared. I don't know who moved it. Those were the only two times I saw the gun. I had seen him have an automatic he carried with

him every day. The automatic on the reporter's desk looks just like the one he had."

On cross-examination the witness stated:

"When Joe got back I helped him load the whisky in the car. We did not stop to load coloring or anything in. Joe certainly did say what I said he said about what he would do to Mr. Swink. After this happened Mrs. Swink did not come and bring me any groceries; nor did she leave any for me. None of the Swinks came and talked to me. Out at the road, out close to where Aubrey Herrington lives, I was ploughing and she come to the road and talked to me. That was the day they arrested me. She talked about planting the crop, and not about this case. Mrs. Sallie Swink was the one who came and talked to me. Q. You testified in the preliminary hearing down here about this, didn't you? A. Yes, sir. Q. I will ask you if you gave this answer: 'Q. Did you know whether or not Joe had a pistol at the time? A. No, sir.' A. At what time? Q. At the time he asked. 'Q. He said if Jordan said anything to him about the whisky, he was going to shoot him half in two, and told you that you had better get out of there?' A. Yes, sir. Q. Did you know whether or not Joe had a pistol at the time? A. No, sir. Q. Did you ever see the sawed-off shotgun around there where Joe worked? A. One time. Q. Did you make that answer? A. Where he worked; but this was in the car when I saw it. Q. Describe that shotgun to the judge. A. I couldn't hardly describe it. It was laying on top of a box, just like that table, there, and Mr. Swink said to Joe, 'You don't need that, why don't you do something with it?' Q. And then it disappeared after that? A. Yes. Q. Is that right, and you say that was the only time you saw it, one time? A. I saw it again. Q. And now you say you saw it again? A. Yes, sir."

The foregoing is the testimony introduced by the state and the defendant, having any definite bearing upon the charge against the defendant.

The defendant has assigned 13 errors, alleged to have been committed by the trial court, which he deems sufficient to warrant this court in reversing his case.

We have set out the testimony as disclosed by the record at great length that the court might have before it what occurred prior to the trial and at the time of the trial in this case.

This record discloses a state of facts, perhaps, not disclosed by any other record. The defendant in this case and his brother Johnnie were indicted as shown by the information, charged with the killing of Jordan Swink. At the time this case was on trial, it was admitted that Johnnie Kizer had been tried and convicted of manslaughter in the second degree.

When the case was called for trial, and the witnesses were called, a witness by the name of Merle Slaton was called and did not answer. Whereupon the county attorney stated in the presence of the jurors who had been subpoenaed to sit in the trial of the case, "Why did she take such a sudden notion to leave and go to Arkansas?" As shown by the record, the county attorney further stated that she should have been here, because process had been served upon her. To which statement of the county attorney the defendant reserved exception.

It developed upon examination that the witness Merle Slaton had not been subpoenaed to attend the trial of Joe Kizer; and the statement of the county attorney was without foundation, and made in the presence of the men summoned to sit as jurors in the case; and as insisted by the defendant were prejudicial to his rights, and deprived him of a fair trial before an unprejudiced jury.

The court denied him the right to make a record on the voir dire examination of the jurors in the presence of the entire panel.

One of the members called to sit as a juror, H. M. Pardoe, stated that after he had heard the statement of the county attorney that he did not feel that he could sit as a juror in the case; and said, "I do not want to sit

as a juror after hearing that remark." The juror Pardoe was excused by the court. The defendant then asked the court to permit him to offer evidence to show the state of mind of the other jurors as to the statement made by the county attorney in their presence.

It is urged by the defendant that the statement of the county attorney left the impression that the defendant had procured the absence of the witness without any testimony to sustain the suggestion.

The record discloses that the said Merle Slaton had not been subpoenaed, and that the statement made by the county attorney was without foundation.

Why the court refused to permit the defendant to examine the other members of the panel as to their qualifications to sit in the case on the question of the statement by the county attorney we do not understand. If the accused wished to exercise that right, he should have been given a reasonable opportunity to discover the state of mind of the jurors, on any collateral matter reasonably liable to influence them, including possible secret obligations or affiliations such as are disclosed here. An examination of a juror on his voir dire has a twofold purpose: First, to ascertain when a cause of challenge exists; and, second, to ascertain whether it is wise or expedient to challenge peremptorily. We think the right of the accused to challenge jurors peremptorily, under the peculiar circumstances shown in the record, was prejudicially impaired. Cooley v. State, 34 Okla. Cr. 281, 246 P. 650.

In Helm v. State, 11 Okla. Cr. 404, 146 P. 1083, in the first paragraph of the syllabus, this court stated:

"The examination of jurors upon voir dire, and the challenges of counsel to any juror for cause or otherwise, and the exceptions to the rulings of the court on such challenges or otherwise, are part of the proceedings during the trial, and the defendant is entitled to have the same and all other proceedings, upon his demand or re-

quest, taken down by the court reporter and correctly transcribed for use in subsequent proceedings in the trial court, or upon appeal."

In Henderson v. State, 18 Okla. Cr. 611, 197 P. 720, in the first paragraph the court stated:

"It is the duty of courts to enforce a rigid and vigilant observance of the provisions of the statutes designed to preserve inviolate the right of trial by jury and the purity of jury trials."

No one can tell what the answer of the other members of the jury panel would have been if the attorney for the defendant had been permitted to ask them as to whether or not the statement of the county attorney made an impression upon their minds that would in any way, whatever, interfere with the proper consideration of the facts in the case.

The examination of jurors upon the voir dire, and the challenges, and the exceptions in these examinations are part of the proceedings during the trial; and the defendant is entitled to have the same taken by the court reporter and correctly transcribed for use in subsequent proceedings in the trial court or on appeal.

Either party has the right to ask jurors pertinent questions for the purpose of determining whether he desires to exercise a peremptory challenge. Cooley v. State, 34 Okla. Cr. 281, 246 P. 650; Johnson v. State, 28 Okla. Cr. 254, 230 P. 525; 35 C. J. 387.

The defendant next insists that he was prohibited from having a fair trial by reason of the special counsel, employed to assist in the prosecution, making side remarks without addressing the court, many of which appear in the record:

"By Mr. Welch: He asked that." And the witness' voluntary statement following, "That is not a fair question."

"By Mr. Welch: This testimony is proper unless he wants to quibble. By Mr. Welch: You asked him the question. By Mr. Welch: Did you, Mr. Brewer, if you didn't want me to ask him, I am not going to ask him the question. By Mr. Welch: That is improper. He said on the chiffonier. By Mr. Welch: That is immaterial. If he didn't have one, it didn't give the right to kill him. By Mr. Welch: It wasn't correct, if it was. By Mr. Welch: Johnnie, have you ever been convicted and served a term? A. I have not. By Mr. Brewer: You had a trial about this? A. Yes, sir. By Mr. Welch: You don't need * * *. Wait a minute."

The court announced:

"Gentlemen of the Jury, there has been some testimony here as to the trial of Johnnie Kizer. For the benefit of the jury, I admonish you that this has nothing to do with the case. A severance was taken, and Johnnie Kizer's case has been tried, and his case is on appeal. This is by agreement of the parties."

Mr. Welch proceeded further and asked him if he had not been convicted of a felony, which the witness denied.

The state repeatedly throughout the trial asked many questions of the witnesses, tending to discredit the witnesses for the defendant, but offered no proof to show former convictions where the witnesses for the defendant or the defendant had served a term in the penitentiary.

This question has been before the court many times. The record is full of side remarks and statements by the attorneys representing the state, without addressing the court, and insinuating facts not proven or attempted to be proven by the state.

In Neely v. State, 60 Okla. Cr. 99, 61 P. 2d 741, in the second paragraph of the syllabus, the court stated:

"The repeated asking of incompetent questions, which clearly have for their purpose the intimation of something to the jury that is either not true or not capable of being proven if true, is wrong, and such conduct of counsel is

not cured because the court sustains the objections to the questions."

In Cook v. State, 36 Okla. Cr. 285, 253 P. 1029, 1031, the court said:

"It is an abuse of judicial discretion to allow questions to a witness which are manifestly calculated to create prejudice in the minds of the jury against the witness, and, if he be the defendant, influence them to find against him because of such prejudice." Smith v. State, 14 Okla. Cr. 348, 171 P. 341; Appleby v. State, 11 Okla. Cr. 284, 146 P. 228; Watson v. State, 7 Okla. Cr. 590, 124 P. 1101; Klaassen v. State, 39 Okla. Cr. 402, 266 P. 495.

It is a well-established rule that impeaching questions should not be propounded to a witness unless they are based upon facts that the interrogator intends to present in refutation of adverse answering of questions propounded; such line of questioning should be done in good faith, and not for the purpose of prejudicing and arousing suspicion of the jury against the defendant.

The condition of the record in this case is such that propounding of the questions by the attorneys representing the state could not do otherwise than prejudice the minds of the jurors against the defendant.

The defendant next argues that the court made an unwarranted comment on the evidence, amounting to a declaration as to what the evidence was, when the following colloquy took place:

"By Mr. Brewer: When you saw the shotgun with the big barrel? By the Court: She didn't call it a sawed-off shotgun. By the Court: But she didn't say a sawed-off shotgun, and the jury is admonished that there is no testimony showing that there was a sawed-off shotgun in the car. By Mr. Brewer: I appreciate that fact, too, Court please. I think that the testimony should be stricken as incompetent, irrelevant, and immaterial. By the Court: She said there was a gun, but not a sawed-off shotgun. By Mr. Brewer: But it is to impeach the defendant that it was a sawed-off shotgun. We move to strike the evi-

dence. By the Court: Overruled. By Mr. Brewer: And exception allowed."

A person accused of a crime is entitled to have a fair and impartial trial, and it is the duty of the trial court to see that fair and impartial trials are had, and that all rights of the accused, as well as the rights of the state, are properly preserved. Noel v. State, 17 Okla. Cr. 308, 188 P. 688; Kelley v. State, 31 Okla. Cr. 51, 236 P. 915; Chuculcate v. State, 36 Okla. Cr. 404, 254 P. 984; 8 R. C. L. 67.

Every person charged with crime, whether guilty or innocent, is entitled to a fair and impartial trial according to the due and orderly course of the law, and it is a duty resting upon the courts to see that the guaranty of such a trial, conferred by the laws upon every citizen, shall be upheld and sustained. Sutton v. State, 35 Okla. Cr. 263, 250 P. 930.

When the record shows that defendant did not have a fair trial, the case will be reversed. Dupree v. State, 10 Okla. Cr. 65, 134 P. 86.

A defendant, whether guilty or innocent, has a constitutional right to have a fair trial. Bramble v. State, 37 Okla. Cr. 35, 255 P. 1104; Clark v. State, 12 Okla. Cr. 263, 154 P. 1005.

A fair trial for a criminal offense consists not alone in an observation of the naked forms of law, but in recognition and just application of its principles.

The statements of the court in his colloquy with the attorney for the defendant indicate that the court was expressing his views on the testimony that was then being discussed between him and counsel for the defendant. The statements of the court on that question were not justified, and may have influenced the jury in the verdict of guilty or in fixing the punishment.

The defendant next urges that the court erred in admitting over his objection the transcript of the testi-

mony of Merle Slaton, taken in a hearing before the county judge on application for bail.

An examination of the record shows that the state failed to show any diligence in trying to secure the witness' attendance, not even having a subpoena issued prior to the date the case was called for trial.

In order to make the witness' testimony admissible, it was necessary that the state should show that it had used diligence in trying to secure the attendance of the witness by having process issued and served upon the witness, or tried to have it served and failed. The fact that the witness was called for trial is not sufficient to warrant the court in admitting the testimony of the witness over the objections of the defendant.

The transcript, as admitted, shows that it does not relate to this defendant, but relates to his brother Johnnie, who came to her store sometime on the evening of the killing of Jordan Swink for some shotgun shells; but she did not know whether it was before or after the killing. The defendant was not present.

This question has been before the court in many cases wherein it has been held that diligence must be shown, and that sufficient facts should be presented to the court to show that the witness is beyond the jurisdiction of the court. Scott v. State, 43 Okla. Cr. 232, 278 P. 393, and cases therein cited.

The defendant further complains of the action of the county attorney in his closing argument, in which Mr. Gross, amongst other things, stated:

"This is one pure D murder, and come here and fib and catch them. What are you going to do? If I was on that jury, I know, I would give that man a life sentence. I might spare his life, but I would give him a life sentence. I thank you."

This court has often held that it was improper for the county attorney to state his personal opinion as to the

defendant's guilt or to state facts not proved by evidence or otherwise given before the jury, that which amounts to his own opinion. To make such statements to the jury is calculated to arouse the passion and prejudices of the jury against the defendant, and is improper. It is an error when permitted over the objections of the defendant. Thurmond v. State, 57 Okla. Cr. 388, 48 P. 2d 845, and authorities therein cited.

It is further argued with a great deal of force that the county attorney in the examination of the witnesses propounded what would be impeaching questions to the witnesses by asking them about previous convictions, and other acts tending to reflect on the character of the witnesses; and then failing to follow it up with any proof, showing that the facts inquired of by the county attorney were true.

This court has repeatedly held that such a line of questioning should be done in good faith and not for the purpose of prejudicing and arousing suspicion of the jury against the defendant. Klaassen v. State, 39 Okla. Cr. 402, 266 P. 495; Cook v. State, 36 Okla. Cr. 285, 253 P. 1029.

Where the prosecuting attorney is permitted to ask questions of a witness which are manifestly calculated to create prejudice in the minds of the jury against the witness, and if he be the defendant, to influence them to find against him, because of prejudice, it is an abuse of judicial discretion to allow such questions. Appleby v. State, 11 Okla. Cr. 284, 146 P. 228; Neely v. State, 60 Okla. Cr. 99, 61 P. 2d 741.

In Brummett v. State, 39 Okla. Cr. 284, 264 P. 224, in the second paragraph of the syllabus this court said:

"Where the county attorney subjected the defendant to a series of immaterial questions as to other offenses and questions tending to degrade and belittle him, the objection of the defendant to the questions of the county attorney should have been sustained, and the court erred in overruling defendant's objection."

It is clear from the record that throughout the entire trial of the Joe Kizer case, John Kizer's actions were held out before the jury; and that the defendant Joe Kizer, who was with the defendant John Kizer at the time he killed Jordan Swink, was practically tried and convicted upon facts brought out in the John Kizer case, and upon the further fact that John Kizer had been convicted and sentenced.

Beginning with the calling of the case for trial, the error of the court in refusing to permit the defendant to question jurors on their voir dire as to the statement of the county attorney as to the absent witness had on their minds, and the argument back and forth at different times during the trial, and the remarks of the county attorney without addressing the court, and the action of the court in arguing with the attorney for the defendant, and contradicting him as to what the witness' testimony was regarding the shotgun, and the closing argument of the county attorney, giving his opinion as to what he would do if he were on the jury, and the action of the county attorney in asking questions tending to discredit, bias, and prejudice the defendant's rights before the jury when he had no proof to show the facts inquired about were true in the event the defendant denied them, clearly show that the defendant Joe Kizer was denied that fair and impartial trial guaranteed to him by the Constitution of the United States, U. S. C. A. Const. Amend. 6, the State of Oklahoma, Okla. St. Ann. Const. art. 2, § 20, and its laws, and the action in the trial of the case on behalf of the court and the state was such as it must have biased and prejudiced the jury in the finding of its verdict, as the sentence imposed was 50 years in the penitentiary.

This opinion has been extended at length in order to show all the facts and actions of the parties, beginning with the trial and throughout the trial until the verdict was rendered, and the motion for a new trial was disposed of.

Considering all these facts and the record as it appears to this court, we hold that the defendant did not have that fair and impartial trial guaranteed to him by the Constitution and laws.

For the errors herein above set out, the case is reversed.

DOYLE, P. J., and BAREFOOT, J., concur.